J. Beidler Camp and Robert A. Donnelly, Appellants v. Henry L. Hollis and Honore Palmer, Defendants. Henry L. Hollis, Appellee.

Gen. No. 43,754.

Opinion filed June 26, 1947. Released for publication
July 8, 1947.

Rathje, Hinckley, Kulp & Sabel and Hirsch E.
Soble, all of Chicago, for appellants; Hirsch E. Soble,
of Chicago, of counsel.

Winston, Strawn & Shaw, of Chicago, for appellee;
James H. Cartwright and Edward J. Wendrow, both
of Chicago, of counsel.

Mr. Presiding Justice Friend delivered the opinion
of the court.

Plaintiffs appeal from a judgment of the circuit
court striking their complaint consisting of two counts
and dismissing the cause at plaintiffs' costs. The
question involved is the sufficiency of a complaint filed
against Honore Palmer, a resident of Florida, who
is the surviving trustee under the will of Bertha
Honore Palmer, and Henry L. Hollis, a resident of
Chicago, Illinois, who is manager of the trust estate.
Summons was served upon Hollis, who appeared and
moved to strike the complaint and dismiss the suit.
Palmer was not served and did not appear.

From the allegations of Count I it appears that
plaintiffs are licensed real estate brokers; that defend-
ant Palmer was the trustee of the estate of Bertha
Honore Palmer, deceased, and Hollis was the general

manager of the estate under Palmer's supervision; that the estate owned substantially all the shares of stock of Palmer House Company, a corporation which owned and operated the Palmer House, a large hotel in Chicago; that in March 1944 plaintiffs asked Hollis whether the Palmer House was for sale and were told that while it was not for sale, anything was for sale at the right price; that some five months later, on August 16, 1944, they talked to P. J. Dee of Chicago and informed him of their reasons for believing that the hotel could be purchased if the price was satisfactory to defendants; that Dee purported to represent a group of men who might be interested in purchasing the hotel, headed by Conrad N. Hilton and including, in addition to Dee, Lawrence Stern, Henry Crown, Floyd Odlum, L. Boyd Hatch, S. J. Gregory, and other individuals connected with Lawrence Stern & Company, Alliance Theatre Corporation, and various other motion picture enterprises, commonly known as the Hilton group, who were well able to finance the purchase of the hotel; that Dee telephoned Hilton in New York and was told to initiate negotiations for the purchase, and thereupon told plaintiffs to approach defendants with a view of ascertaining definitely whether the hotel was for sale and at what price it could be purchased.

On the following day, August 17, 1944, plaintiffs conferred with Hollis, informed him that a group of men of large financial means was interested in acquiring the hotel, and wanted to know whether it was for sale. Hollis refused to furnish the information unless plaintiffs would disclose to him the names of the men comprising the group or syndicate. The complaint then alleges ''that plaintiffs refused to make such disclosure unless defendants would treat the same in the strictest confidence and would protect plaintiffs in the brokerage commissions if said estate's interest in the hotel was sold to said men, or any one or more of

them, or any one or more of them in combination with others; that it was thereupon orally agreed between plaintiffs and defendant Hollis, acting for himself and defendant Palmer, and either within or without the scope of his authority from defendant Palmer, that if plaintiffs would make such a disclosure, defendants would treat the same in the strictest confidence, and that if said estate sold its stock interest in said Palmer House Company to said men, or any one or more of them, . . . defendants would pay plaintiffs their brokerage commission of 5 per cent on the first $50,000 of the sale price and 3 per cent on the excess selling price over $50,000, in accordance with the schedule of commission rates and rules established by the Chicago Real Estate Board''; and ''that pursuant to said agreement'' plaintiffs disclosed to Hollis the names of the Hilton group and certain banking references furnished them by Dee, including Edward E. Brown, president of the First National Bank of Chicago.

The disclosure of the information upon which the alleged oral contract of Count I is predicated was the last and only thing done by plaintiffs in connection with the sale of the Palmer House, for which they seek to recover $601,000 as ''brokerage commissions.''

The complaint alleges that at the conclusion of the conversation had on August 17 Hollis informed plaintiffs that he would investigate the matter and advise them further. Apparently Hollis made an investigation, for on the afternoon of the same day he wrote plaintiffs the following letter, set forth in the complaint: ''In conversation this morning in my office you stated that you represented a syndicate interested in purchasing the Palmer House and giving the names of Lawrence Stern, Mr. Hilton, Floyd Odlum, Hatch, Gregory and people controlling the Alliance Theatre Company. I find that you are not authorized to represent them and further I am informed that you have made representation that you represent me, which of

course is not the case. Accordingly I will have no further discussion with you on the subject of the sale of the Palmer House." It is alleged that "said letter was false in that the plaintiffs did not claim to represent either said group or Hollis, and was conceived for the fraudulent purpose of evading the obligations imposed by said confidential and contractual relationship upon the defendants, and either of them." The following day, August 18, the plaintiff Camp wrote Hollis as follows: "Replying to your letter of August 17, 1944, I have to report that you do me an injustice." It is then alleged that "in utter disregard of the trust and confidence reposed in defendants by plaintiffs as aforesaid, and in violation of the agreement alleged" in the complaint, "defendants, unbeknown to plaintiffs, negotiated and dealt with said group of men, or one or more of them, . . . for the sale of the stock interest of said estate in said Palmer House Company; that as a consequence thereof, defendant Palmer, as trustee of said estate, sold and conveyed, on or about December 19, 1945, for approximately $20,000,000.00, the entire stock interest of said estate in said Palmer House Company to a group which was headed by Hilton and included Lawrence Stern, H. L. Stern, also connected with Lawrence Stern & Company, Crown, Odlum, Hatch, Dee, and others."

The first count then alleges certain pertinent provisions of the Chicago Real Estate Board Schedule, and prays judgment for $601,000 "for their [plaintiffs'] brokerage commissions" against the defendants, or against Hollis if his acts and doings did not bind defendant Palmer.

Count II repeats substantially all the material allegations of Count I, and differs therefrom only in the allegations "that by reason of said confidential disclosure and relationship, the duty was imposed upon defendants, and either of them, to refrain from

negotiating and dealing with said group of men, or any one or more of them, directly or indirectly, with regard to the sale of the stock interest of said estate in said Palmer House Company, without the knowledge and consent of plaintiffs," and "that thereafter, in utter disregard of the trust and confidence reposed in defendants by plaintiffs as aforesaid, defendants, unbeknown to plaintiffs, negotiated and dealt with said group of men, or one or more of them, for the sale of the stock interest of said estate in said Palmer House Company; that as a consequence thereof, defendant Palmer, as trustee of said estate, sold and conveyed, on or about December 19, 1945, for approximately $20,000,000.00, the entire stock interest of said estate in said Palmer House Company to a group which was headed by Hilton and included Lawrence Stern, Crown, Odlum, Hatch, Dee, and H. L. Stern, also connected with Lawrence Stern & Company''; and "that by reason of said premises, defendants, and either of them, became and are liable to pay to plaintiffs the fair, usual and customary brokerage commission for their said services," which is alleged to be $601,000, and for which plaintiffs pray judgment.

Recognizing the long established rule in this and other states that before a real estate broker can recover for commissions earned under a brokerage contract, he must show that he has either sold the property in question, been instrumental in bringing about the sale, or that he has procured a purchaser who was ready, willing and able to purchase at the stipulated terms (*Davis v. Gassette,* 30 Ill. App. 41; *Stone v. Ferry,* 144 Ill. App. 191, aff'd in 239 Ill. 606; *Wentworth v. Mann,* 178 Ill. App. 621; *Murawska v. Boeger,* 219 Ill. App. 241; *Wilson v. Mason,* 158 Ill. 304), and that "a broker is never entitled to his commissions for unsuccessful efforts" (*Sibbald v. Bethlehem Iron Co.,* 83 N. Y. 378), plaintiffs concede that their complaint is not predicated on the usual broker-

age employment, but on the breach of an express oral agreement alleged in Count I, and their counsel argue that when plaintiffs made the requested disclosure to Hollis, his promise to pay them the specified commission if the estate sold its interest to the Hilton group became a valid and binding obligation, and that a year later when the sale was made, the obligation matured and became enforceable. For this contention plaintiffs rely on the rule of law stated in 17 C. J. S. Contracts, sec. 100 (d), pp. 449, 450, as follows: "Thus, if A promises B to pay him a sum of money if he will do a particular act or make a particular promise, and B does the act, the promise thereupon becomes binding, although B at the time of the promise does not engage to do the act or to make the promise. . . . on the performance of the condition by the promisee, it [the promise] is clothed with a valid consideration which relates back to the promise, and it then becomes obligatory. Therefore, a contract to pay a certain sum, on the performance of certain acts by another becomes a binding obligation on the promisor on the performance of said acts before the revocation of the contract . . . ," and they also cite two Illinois decisions, *Plumb v. Campbell,* 129 Ill. 101, and *Witkowsky v. Affeld,* 283 Ill. 557, approving this rule.

The fundamental difficulty with the allegations of Count I, and the applicability of the authorities cited, is that the agreement upon which plaintiffs rely, when construed in the light of decisions hereinafter discussed, does not provide for the payment of commissions unless plaintiffs shall become instrumental in procuring the sale. It is conceivable, of course, as defendants' counsel argue, that "a contract could be made to pay $600,000 simply for the names of a group of wealthy men who might be interested in buying the Palmer House if it could be bought at a satisfactory price, in the event the hotel were ever sold to the men

on the list, or any of them, whenever and however the sale was effected,'' but, as they say, such an agreement would have to be expressed in clear and unmistakable language and certainly cannot be implied from the allegations of the complaint, construed in the light of the preliminary demand that plaintiffs be protected in their ''brokerage commissions.'' It is a well recognized rule that where a contract is susceptible of two constructions, ''one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred.'' 12 Am. Jur., Contracts, sec. 250, p. 792. Applying this rule to the allegations of Count I, we think the agreement there alleged amounts to nothing more than that plaintiffs should have their commissions if, as a result of the disclosure of the names and of the work done by plaintiffs *as brokers,* a sale was made to the Hilton group, or some of them. Count I does not allege that the sale was made as the result of any work done by plaintiffs or that they were the procuring cause. Evidently Hollis did not understand that he was making an unconditional agreement to pay plaintiffs if a sale were made to the Hilton group regardless of plaintiffs' participation in the transaction, because after receiving the information he still refused to discuss the sale of the Palmer House with them, merely stating that he would investigate, and on the same day he wrote plaintiffs that his investigation disclosed that they were not authorized to represent the Hilton group and since they did not represent him in the negotiation he would have no further discussion with them on the subject. If plaintiffs' construction of the oral agreement were sound, Hollis' letter would border on the ridiculous, because under plaintiffs' contention they would still be entitled to their commission regardless

of who was instrumental in making the sale, and his letter certainly does not indicate that he understood or intended to enter into any such unusual contract with them. It was, of course, incumbent upon the court to construe the contract, and in determining what was meant thereby, to take into consideration the conduct of the parties and the attending circumstances.

Both sides concede that there are no Illinois cases touching directly on the controverted point, and apparently neither side has been able to find any case in other jurisdictions where brokers were permitted to recover brokerage commissions from a sale in which they had no part unless it was unequivocally so provided in the agreement. The only case cited by plaintiffs which has any bearing whatsoever on the question is that of *Hanlon v. Dunne*, 189 Ill. App. 123. There the agreement was in writing and gave the broker a 30-day exclusive right to sell the property, and expressly stated that the commission of $120 would be paid "if a purchaser is procured during said period, by you or me or any one else, upon any terms that I may accept." This was, in effect, an express negation of the requirement that the broker procure the purchaser, and defendants' counsel argue that this is exactly the kind of language that would have had to be used here to require the court to construe the present agreement in accordance with plaintiffs' contention.

There are cases in other jurisdictions, however, in which agreements were so construed as to deny the broker commission where he did not himself effect the sale. *McDonald v. Mandeville*, 261 Fed. 778, was the second of two appeals. In the first of these, *Mandeville v. MacDonald*, 250 Fed. 607, judgment for plaintiffs was reversed. Plaintiffs, as brokers, contended that in consideration of their efforts to purchase certain utility companies for defendants, the latter had

agreed to pay them a 5 per cent commission on the purchase price if the defendants purchased a particular company. Plaintiffs' efforts to arrange a purchase were fruitless, and finally a purchase was made through direct negotiation. MR. JUSTICE LEARNED HAND, in the first opinion, made the following pertinent observations: ''Now, of course, a buyer might promise anything; he might agree to pay for failure as well as for success, but clearly he must say so pretty plainly, and here we have nothing but words which normally mean no more than the conventional agreement. We cannot agree that, with every allowance for the latitude of a jury in the interpretation of spoken words, these words admitted any such meaning. The implied request was for services which might result in bringing Purdy to terms. If the meaning was that the plaintiffs should be paid for services which ended in nothing, the contract must have so stated.'' On the second appeal brought from the judgment rendered in a retrial of the cause as directed in *Mandeville v. Mac-Donald*, 250 Fed. 607, MR. JUSTICE HOUGH said that ''it is still true that plaintiffs do not sue to recover the usual broker's commission for bringing together the minds of a willing seller and a willing and able buyer, but [the complaint] states as the ground of recovery . . . that—'The agreement to pay the plaintiffs was dependent on the defendants buying, and not upon the plaintiffs being the procuring cause of the sale.' To repeat what we said before on this point, a buyer may promise anything; he may agree to pay for failure as well as success, but when the unusual contract is asserted, it can never be spelled out of words normally importing only the conventional —i. e., the familiar brokerage employment, which is always of the 'no cure, no pay,' kind.''

In *Wykoff v. Bissell*, 24 App. Div. 66, 48 N. Y. Supp. 1018, plaintiffs sued for commissions upon an exchange of properties. Plaintiffs, as brokers, had procured

from the agent of Williams a list of properties which Williams had for sale, and submitted this list to the defendant. Upon this list was the property which was finally exchanged for defendant's property. In stating and construing the agreement, the court said: "The contract, as sworn to by the plaintiffs on the trial, was that, if the defendant made an exchange of his property for any of the properties submitted to him by the plaintiffs, he (the defendant) would pay $3,000 commissions. This contract cannot fairly be construed as an agreement that the defendant would pay the commissions unless the exchange was brought about by the plaintiffs under such circumstances as would entitle them to brokers' commissions, under the well-settled principles of law applicable to the right to recover such commissions. . . . The theory upon which the verdict was rendered seems to have been that the agreement made by the defendant was that if he made the exchange he would pay the plaintiffs $3,000. commissions, whether the exchange was effected through the agency of the plaintiffs as procuring cause or not; and it was apparently assumed that if such a contract was made by the defendant, and he afterwards made the exchange, he was liable for the $3,000, even though the only part which the plaintiffs had in the matter was to present the list of property which Williams had for sale or exchange to the defendant. As we have seen, this was not, properly construed, the contract entered into by the defendant."

In *Davis v. Van Tassel,* 107 N. Y. Supp. 910, the written agreement contained the following provision: "It is hereby expressly agreed that in consideration of efforts put forth and to be put forth that you are the recognized sole agent for the property briefly described below for the period of six months from the 19th day of August, 1905 [then follows a description of various properties]. And at such time as a sale shall be effected for any of the above-mentioned prop-

erty for the prices named, or at any other price, during said term, I hereby agree to pay you the sum of 2 per cent. on the selling price of the improved property and 5 per cent. on the selling price of the vacant property at such time as such sales are effected.'' One of the parcels was sold by direct negotiation between the purchaser and the owner, and plaintiff claimed his commissions. In commenting on these facts the court said: ''The plaintiff bases his suit for commissions upon the peculiar wording of the contract between him and the defendant's intestate, claiming that he became entitled to the commission, no matter how the sale was brought about, because it occurred within the six months specified in the contract. This claim does not seem to me to be justified. No doubt a contract could be made whereby, in consideration of the efforts made by an agent to sell property, the owner might obligate himself to pay a sum agreed upon if the premises were sold, even without the aid of the broker; but it does not seem to me that this is such a contract. The plaintiff is constituted the recognized sole agent for the property; but there is nothing in the fact of sole agency which in itself gives the broker any right to commissions, unless he is the procuring cause of the sale, and that his right to commissions in this case depended upon his rendering some effective service in promoting a sale seems to be in harmony with the words: 'And at such time as a sale shall be effected for any of the above-mentioned property for the prices named . . . I agree to pay you the sum of 2 per cent. . . . at such time as such sales are effected.' This language seems to me to mean sales brought about or effected through the agency created by that contract, and does not refer to a sale made by the owner himself, toward the accomplishment of which the agent contributes nothing.''

In *Parkhurst v. Tryon,* 134 App. Div. 843, 119 N. Y. Supp. 184, Parkhurst agreed in writing that he would

advertise and attempt to sell for Tryon certain properties, and Tryon covenanted ''That in case of the sale or conveyance of said property, at any time within one year from this date or thereafter until he notifies [Parkhurst] in writing, he will pay [Parkhurst] five per cent. of the amount of the sale.'' Within the year Tryon made a sale without the intervention of Parkhurst, and the court, after stating that the only question related to the construction to be given to the contract, held that the sale referred to in the language of the agreement was one made by Parkhurst, ''or one brought about by him; he having found the purchaser, and brought Tryon and the purchaser together. The contract does not seem to us to give Parkhurst, during the year, the exclusive right of sale, to the exclusion of Tryon himself. Very likely Tryon could not have sold through some other agent; but he did not do that. . . . A reasonable construction should be given to the words, and not a constrained one, which would enable Parkhurst to recover commissions upon a sale he was in no way responsible for, and would prevent Tryon from selling himself, without becoming liable to Parkhurst for full commissions on the sale.''

In *Tomlinson v. Meader,* 38 N. Y. S. (2d) 291, plaintiff sued for commissions on an exchange of farm properties, and the court, in construing the agreement, said: ''The words of the listing agreement, carried out literally, could indicate that all the plaintiff had to do to earn his stated commission would be to introduce to the defendant a person who subsequently purchased her property or traded with her on terms accepted by her, independent of any subsequent action on the part of plaintiff and independent, likewise, of any efforts of another person which contributed to the consummation of the transaction. Having in mind the usual understanding as to the prevailing custom in compensating a real estate broker, it seems unlikely

that either party had any such result in mind as to the operation of the agreement; rather, it seems that both understood that the agreement anticipated that, after the plaintiff 'procured or introduced' a person to defendant, he would bring about a sale or exchange with such person, or that, if the defendant herself effected a transfer of her property to or with such person on substantially the terms given plaintiff by defendant, plaintiff would be protected against acts of bad faith on the part of the defendant. Under this construction, it would still be necessary for the plaintiff to show that he was the efficient and procuring cause of the sale or exchange of the property, which definitely he was not. Any other interpretation would seem to be oppressive or inequitable to the defendant; it is certainly not clear that at the time the agreement was made, it was her intention to so handicap herself in respect to the sale of her property.''

In *Sunnyside Land & Investment Co. v. Bernier,* 119 Wash. 386, 205 Pac. 1041, the broker was given a three-month exclusive right to sell the property under the following agreement: ''The second party [plaintiff] in consideration of the premises hereby agrees that it will endeavor to sell said premises, and the first party [defendant] in consideration of said agreement and the payment of one dollar ($1) does hereby agree to and with the second party that he will in case of sale, or if said second party is instrumental in finding a purchaser, pay said second party a commission on the selling price of five per cent.'' Commenting on this agreement, the court made the following observation: ''The concluding clause of the contract, it will be observed, provides that the broker will endeavor to sell the premises, and that the owner agrees to and with him 'that he will in case of sale, or if the second party is instrumental in finding a purchaser,' pay the broker a stipulated commission. It is argued that the language quoted from this clause of the con-

tract renders the owner liable in the case of a sale, regardless of who was the procuring cause of the sale. But it is manifest, we think, that the language means a sale to a customer procured by the broker, and is without reference to a sale with which the broker has nothing to do.''

██ ██ Plaintiffs argue that none of the foregoing decisions, which are characterized by their counsel as the usual and familiar brokerage-employment contracts, is applicable, either because the cases were decided against the broker claiming commission on the merits or for lack of sufficient proof; that none of them was determined on a motion to strike a complaint; and that "all of them held that the parties can make any contract they choose to make.'' It may be conceded that none of them involved a situation such as is alleged here, and that ordinarily parties may make such agreements as they choose to make; nevertheless, the decisions all hold that when agreements which are susceptible of two constructions are presented to the courts, they will adopt the interpretation which makes a rational and probable agreement, and that where contracts involving brokerage commissions do not in so many words provide that commissions shall be paid even though the broker is not instrumental in procuring a sale, no commission will be allowed. In the case at bar the allegations of Count I are not susceptible of the interpretation for which plaintiffs contend, and we think the case falls within the rule laid down in the numerous decisions from which we have quoted at length.

██ It is contended by plaintiffs that Count II is predicated on a tortious violation of a confidential relationship, resulting in damages to them. It is argued that a confidential relationship existed between the parties, by reason whereof the law imposes certain obligations and duties upon the fiduciary, which are implied; that Hollis violated the confidential relation-

ship, to plaintiffs' damages; and that an action at law lies against the fiduciary for the breach of a duty arising from a confidential relationship. These contentions are predicated largely upon the allegation that plaintiffs refused to make the disclosure as to the interested parties unless defendants would treat the same "in confidence," and "that by reason of said confidential disclosure and relationship, the duty was imposed upon defendants, and either of them, to refrain from negotiating and dealing with said group of men, or any one or more of them, directly or indirectly, with regard to the sale of the stock interest of said estate in said Palmer House Company, without the knowledge and consent of plaintiffs." Generally speaking, confidential relationships exist in many cases where one party has gained a dominating and controlling influence over another and a resulting trust and confidence has developed, but plaintiffs cite no cases in which it has ever been held to exist where men meet for the first time, and only once, and thereupon enter into an express agreement which contains none of the elements of a confidential or fiduciary relationship other than the words "in confidence." Defendants argue that this phrase, as alleged in the agreement, merely describes and determines the limitations of the agreement itself and establishes no relationship between the parties other than a simple contractual one. We would be extremely reluctant to hold, as plaintiffs contend, that the list of names given to Hollis constituted some sort of trust assets of which he and Palmer were trustees and the plaintiffs beneficiaries. Moreover, Count II nowhere alleges that defendants made the slightest use of the list or of any information given to them by the plaintiffs in connection with the disclosure thereof. From the fact that the property was sold to the Hilton group the court would not be justified in assuming that the parties were eventually brought together by reason of the

information given Hollis more than a year before the sale was made. If plaintiffs had desired to proceed upon the theory that defendants, after obtaining the names of the interested parties, negotiated with them behind plaintiffs' backs, it was incumbent upon them to allege that use had been made of the confidential information in violation of Hollis' promise, in substantiation of their theory that Count II was predicated upon a tortious violation of a confidential relationship, if one existed, by reason of which plaintiffs sustained damages. It must be admitted, of course, that a trustee cannot use trust assets for his own benefit and to his own profit, but there is nothing in these pleadings which specifically alleges that the defendants made use of the list or of any information disclosed to them by plaintiffs. The decisions cited by plaintiffs deal generally with violation of fiduciary duties arising out of a relation of trust and confidence, but have no application to the allegations of Count II. We are therefore constrained to hold that Count II is insufficient because it merely alleges an agreement to treat certain information as confidential, and fails to allege that such agreement was violated.

For the reasons indicated we are of opinion that the trial court's judgment is correct and should therefore be affirmed. It is so ordered.

*Judgment affirmed.*

SCANLAN and SULLIVAN, JJ., concur.