In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1163

TINGSTOL COMPANY,

Plaintiff-Appellee,

v.

RAINBOW SALES INCORPORATED,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 8867--William J. Hibbler, Judge.

Argued June 2, 2000--Decided July 7, 2000

Before FLAUM, EVANS, and WILLIAMS, Circuit Judges.

EVANS, Circuit Judge.  This case requires interpreting what a contract meant by the word "orders" and whether something called a "blanket order" qualified.

Tingstol Company of Chicago manufactures printed circuit boards, a car part. In 1983 Rainbow Sales Incorporated became Tingstol's exclusive sales agent in Florida, which entitled Rainbow to a 5 percent commission on all of Tingstol's sales there. Under the terms of their 1993 written contract, either side could pull out of the deal with 60 days notice. Tingstol gave Rainbow 60 days notice to end the relationship in November 1996.

The contract required Tingstol to pay Rainbow "the commissions provided for herein only on orders received by [Tingstol] prior to the termination date." Before Rainbow's termination, Tingstol's biggest Florida customer, United Technologies Automotive (UTA), placed a "blanket order." After the termination, UTA executed a "release" and it was only then that UTA paid Tingstol and Tingstol shipped the circuit boards to UTA.

Rainbow demanded that Tingstol fork over commissions for the sales that followed the

blanket order. Going to federal court under diversity jurisdiction, 28 U.S.C. sec. 1332 (a)(1), Tingstol sought a declaratory judgment that it owed Rainbow nothing. District Judge William J. Hibbler sided with Tingstol on summary judgment, and we now take up Rainbow's appeal.

We review de novo the district court's summary judgment order, mindful that summary judgment is particularly appropriate in cases involving the interpretation of written contracts. Independent Constr. Equip. Builders Union v. Hyster-Yale Materials Handling, Inc., 83 F.3d 930, 932-33 (7th Cir. 1996); Omnitrus Merging Corp. v. Illinois Tool Works, Inc., 628 N.E.2d 1165, 1168 (Ill. App. Ct. 1994). A contract is unambiguous if it is susceptible to only one reasonable interpretation. Hyster-Yale, 83 F.3d at 933; Omnitrus, 628 N.E.2d at 1168. Whether a contract is clear or ambiguous is a matter of law for the court, but the meaning of any ambiguity is a question of fact for a jury. Atlantic Mut. Ins. Co. v. Metron Engr. and Constr. Co., 83 F.3d 897, 901-02 (7th Cir. 1996); Omnitrus, 628 N.E.2d at 1168. Extrinsic evidence is considered only if the contract itself is ambiguous. Metron, 83 F.3d at 901-02; Omnitrus, 628 N.E.2d at 1168.

Rainbow gives two reasons why it deserves commissions (or at least a trial) for the post-termination Tingstol-UTA transaction that followed UTA's pre-termination blanket order. First, it contends that the meaning of "orders" in the contract is ambiguous, does not necessarily connote a binding sale, and requires resolution by a trier of fact. Second, even if only a binding transaction constitutes an order, Rainbow says the blanket order at issue was binding and thus qualifies as an order that generates commissions.

Neither side tarries long--and neither will we--over whether by "orders" the contract could have meant anything less than a firm commitment to buy. The contract's failure to define "orders" does not automatically render the term ambiguous. Sales agents generally earn commissions when there is a sale, not when a customer expresses a vague or tentative interest in a product. Webster's Third New International Dictionary defines this use of order as "a commission to purchase, sell, or supply goods: a direction in writing to furnish supplies." Black's Law Dictionary says "an 'order' is a direction to pay and must be more than an authorization or request." Common understanding of the term is the same. When you place an order at a restaurant, or at a hardware store, or through a web site, you pledge to pay for the goods that the seller will provide. There may be circumstances when you may return the food or the merchandise and get your

money back, but there is nothing ambiguous or exploratory about the order itself. Courts that have interpreted similar termination clauses have held that "orders" means enforceable contracts. See Chicago Fineblanking Corp. v. D.J. Cotter & Co, 1996 U.S. Dist. LEXIS 21882, *12-13 (E.D. Mich. 1996), aff'd, 1998 U.S. App. LEXIS 639 (6th Cir. 1998); Robich v. Patent Button Co., 417 F.2d 890, 892-93 (6th Cir. 1969). Similarly, in this context the only reasonable interpretation of "orders" is that it means a definite commitment by the customer to buy.

The crux of this case is whether UTA's "blanket order" constitutes a binding sale. If the blanket order really was an enforceable sale, Rainbow deserves commissions; if not, Rainbow gets zilch. Rainbow, naturally, contends that the blanket order was the all-important moment and that the "release" was merely a timing device that controlled payment and delivery. Tingstol, unsurprisingly, pooh-poohs the significance of the blanket order and argues that the release is what locked UTA into buying and Tingstol into selling at a certain price.

The blanket order itself expressly limited UTA's liability to the parts it scheduled for release. In other words, UTA had no obligation to buy until it executed a release, and in this case the release came after Rainbow was cut out as Tingstol's sales agent.

The deposition testimony also is consistent on this point. John P. Zopp, Jr., Tingstol's president and chief executive officer, said that the toughest part of getting an order is setting the price, and the price is determined in the release. Zopp said "the only thing that counts in this business is the release." William M. Shaw, UTA's purchasing manager, said that UTA's liability was limited to the amount of circuit boards the company ordered in the release. And Charles M. Plotts, Rainbow's sole shareholder, said in his deposition that he received commissions only after Tingstol shipped the parts--and Tingstol shipped the parts only after they were scheduled for release. He characterized a blanket order as "the carrot that [UTA] waves in front of you. 'This is what we think we're going to use.' You jump on that. Business is business." Asked whether the blanket order was a commitment by UTA to buy, Plotts answered, "No. It's their way out when they want to."

Because it did not bind UTA and there was no element of exclusivity, the blanket order was not a requirements contract. Because there was no consideration, the blanket order was not an options contract, either. What purpose the

blanket order served and why Tingstol bothered with something it claimed was so superfluous is puzzling, but unraveling that mystery is unnecessary to resolving this case. Rainbow only deserves commissions if the blanket order was a firm commitment by UTA to buy. Based on the language of the blanket order itself and the deposition testimony of Zopp, Shaw, and Plotts, there is no genuine issue over the material fact that the blanket order was not binding on UTA.

This case is another example that trust and long-standing personal relationships are no substitute in the business world for a well-written contract. Zopp and Shaw testified that Rainbow was canned because Plotts was not providing good service. Plotts, on the other hand, thought that because he first brought in UTA as a Tingstol customer he deserved commissions from all subsequent Tingstol sales to UTA "until hell freezes over." It is unclear whether Plotts' service truly had deteriorated or whether Zopp turned on his old friend to earn a few extra bucks by cutting out the middle man. What is clear is that the contract only provided sales commissions for pre-termination orders, that orders means binding sales, and that a blanket order was not a binding sale. Consequently, we AFFIRM the district court's grant of summary judgment.