In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3725

DEREK LEWITTON,

*Plaintiff-Appellee,*

*v.*

ITA SOFTWARE, INCORPORATED,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 4210—**Robert M. Dow, Jr.,** *Judge.*

ARGUED SEPTEMBER 24, 2009—DECIDED OCTOBER 28, 2009

Before BAUER, KANNE, and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge.* Three months after Derek Lewitton stopped working for ITA Software, Inc. he attempted to exercise options to purchase 138,900 shares of ITA stock. According to Lewitton, those shares vested pursuant to his employment contract during his 25-month tenure with ITA. When ITA refused to allow Lewitton to purchase more than 34,722 shares, Lewitton filed this suit in Illinois state court claiming that ITA

breached the employment contract. ITA removed the case to federal court under diversity jurisdiction, and eventually Lewitton moved for summary judgment. The district court determined that the employment contract unambiguously establishes a system granting Lewitton options to purchase 5,556 shares per month, subject to forfeiture only if certain triggering events occur. Because the court found that no triggering events had taken place, it concluded that Lewitton is entitled to exercise his remaining options to purchase an additional 104,178 shares. With this finding, the court granted summary judgment to Lewitton. ITA appeals.

The facts are undisputed. ITA is an airline information technology and services provider that offers a product called QPX—an airfare shopping and pricing engine that compares and sorts billions of flight combinations for online travel agents. Although QPX is a shopping tool, it does not have the capability to book reservations or purchase tickets. To bridge this gap, ITA began developing a new travel distribution system called 1U, which was expected to offer the kind of online reservations and purchasing services that QPX lacks. Early in 2005, ITA anticipated that the general rollout of 1U would take place between April and June of that year.

In April 2005, ITA and Lewitton entered into an employment contract agreeing that Lewitton would serve as ITA's vice-president of sales. He was hired to, among other things, supervise ITA's development and marketing of the 1U program. The employment contract sets up a compensation system granting Lewitton "qualified stock options

to purchase up to 200,000 shares of ITA common stock" at a price of $10 per share. Those options "will vest . . . in equal monthly installments of 5,556 shares each . . . except that the first twelve months of options will all vest at [Lewitton's] one-year anniversary."

Although Lewitton's shares vested on a monthly basis after he reached the one-year mark, the contract provides that "up to 150,000 of the options will be subject to forfeiture" depending on whether ITA achieved certain revenue goals. According to the contract's forfeiture clause, "10,000 options will be retained for each $10 million dollars of ITA's gross revenues for the 12-month period from June 1, 2006, through May 31, 2007 (the "Assessment Period")." The contract states that ITA would determine the revenues for the Assessment Period after it completed its internal accounting for the month of May 2007. But the contract further provides that in the event that ITA's "development schedule for 1U is materially deferred from the schedule presently contemplated, then the Assessment Period will be deferred accordingly—i.e., if the development schedule were to be delayed by two months, the Assessment Period would be August 1, 2006 through July 31, 2007."

Neither the development of 1U nor Lewitton's employment proceeded as the parties expected when they entered the contract in April 2005. ITA had trouble getting airlines and travel agents to commit to using 1U, and the program was scaled back significantly. Eventually, the only work ITA put into 1U were efforts to preserve its economic investment in the program. Lewitton's

employment with ITA ended on May 21, 2007 (the parties do not explain how or why). Three months later, Lewitton attempted to exercise 138,900 options of ITA shares—5,660 options for each month of his 25 months with ITA. ITA permitted Lewitton to exercise only 34,722 options, taking the position that the remaining 104,178 options were forfeited pursuant to the contract's forfeiture clause.

We review the district court's grant of summary judgment to Lewitton *de novo*, keeping in mind that summary judgment is particularly appropriate in cases involving contract interpretation. *See Tingstol Co. v. Rainbow Sales Inc.*, 218 F.3d 770, 771 (7th Cir. 2000). Under Illinois law—which, the parties agree, governs our interpretation of the employment contract—our primary goal in construing the contract is to give effect to the parties' intent as expressed in the terms of their written agreement. *See Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). We first ask if the language of the contract is ambiguous, which is a question we determine as a matter of law. *Id.* A contract is ambiguous if its terms are indefinite or have a double meaning. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 714 (7th Cir. 2009). If the contract is unambiguous, "we must enforce it as written." *Id.* Only if the "contract's language is susceptible to more than one interpretation" would we look to extrinsic evidence to determine the parties' intent. *Camico Mut. Ins. Co. v. Citizens Bank*, 474 F.3d 989, 993 (7th Cir. 2007).

The principal question we must resolve in this appeal is whether the employment contract unambiguously allows Lewitton to exercise all of the shares he accumu-

lated during his 25-month tenure with ITA. The district court determined that the contract sets up a grant of up to 200,000 options—vesting at a rate of 5,660 per month—subject to forfeiture if certain revenue goals were not met by the end of the Assessment Period. Because the contract specifies that the Assessment Period would be deferred if the development schedule for 1U were "materially deferred," and because the parties agree that 1U's development did not progress as they intended, the court found that the Assessment Period was never triggered. Accordingly, the court concluded that Lewitton was not required to forfeit his vested options. ITA contends that the term "materially deferred," is ambiguous and was never meant to apply in the event that 1U was put on the back burner indefinitely. Rather, according to ITA, the term "materially deferred" references a situation where 1U is put on hold for an identified interim period while ITA resources are temporarily diverted elsewhere.

The district court correctly determined that the term "materially deferred" is unambiguous. The contract specifies that if ITA's "development schedule for 1U is materially deferred from the schedule presently contemplated, then the Assessment Period will be deferred accordingly . . . ." As the district court noted, "materially deferred" is not a technical term; its ordinary meaning is "significantly delayed." This straightforward definition is reinforced by the contract itself, which uses the terms "defer" and "delay" interchangeably. In the contract's example illustrating the meaning of "materially deferred," it explains that if the 1U development

schedule were "delayed" by two months, then the Assessment Period would be delayed by two months. It follows from the everyday meaning of "materially deferred" and the contract's own example that the parties intended for the rollout of the 1U program to precede the start of the Assessment Period. ITA concedes that the rollout of 1U did not proceed according to the schedule the parties contemplated on the date of the contract, nor has it occurred to date. Given that concession, the district court correctly determined that the Assessment Period never began and, accordingly, that the forfeiture provision does not apply.

ITA argues that allowing Lewitton to exercise his vested options ignores the "central concept" of the contract, which, according to ITA, is that Lewitton is entitled to exercise more than 50,000 options only to the extent that ITA met certain revenue goals during his employment. ITA explains that none of the other ITA executives earn more than 50,000 options per year. ITA asserts that its CEO initially resisted the contract's extra 150,000-share allotment to Lewitton but eventually agreed to the contract as written because he understood that Lewitton would keep the extra shares only if he was able to generate significant additional revenue for ITA based on the rollout of 1U.

ITA's description of the contract's "central concept" relies heavily on extrinsic evidence of the negotiations that preceded the contract. But extrinsic evidence cannot be used to create ambiguity where none otherwise exists, *see Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th

Cir. 1995), and it is misplaced here where the contract includes an integration clause stating that the written agreement "supersedes all prior agreements, understandings or negotiations." The integration clause demonstrates that ITA and Lewitton formally decided "to protect themselves against misinterpretations which might arise from extrinsic evidence," and that they agreed that the "negotiations leading to the written contract *are not* the agreement." *See Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 885 (Ill. 1999). Having agreed to be bound by the contract as written, it is particularly unavailing for ITA to attempt to cloud the contract's interpretation with post-hoc explanations of its state of mind at the time the contract was inked.

At its core, ITA's argument is one of fairness; it argues that enforcing the contract as written unfairly rewards Lewitton above and beyond what ITA considers the value of his contributions to the company. But the contract includes mechanisms that ITA could have used to change the stock-option allotment or to strip Lewitton of his vested shares without invoking the Assessment Period. For example, the contract states that if ITA changed Lewitton's responsibilities so that he is "not primarily involved with 1U, then we will together negotiate a new standard" for the vesting and exercise of his stock options. Moreover, the contract states that additional shares could be forfeited if the ITA board of directors decided that Lewitton was not fulfilling his responsibilities. ITA did not invoke either of these clauses during Lewitton's employment to bring his stock-option compensation in line with its perception of the

value of Lewitton's employment. ITA's failure to pursue these options takes the sting out if its assertion that enforcing the contract as written results in a windfall to Lewitton.

ITA next argues that even if the contract is unambiguous the district court improperly resolved a question of material fact when it concluded that ITA had deferred the 1U program until an unspecified later date rather than scrapping it altogether. According to ITA, there is a genuine dispute over whether the 1U program was delayed or terminated. But this is just another attempt to create ambiguity where none exists. At the summary judgment stage ITA submitted an affidavit from its CEO, Jerry Wertheimer, describing the then-current status of the 1U program. Wertheimer said that he "concluded in consultation with the ITA board that ITA should reduce the resources" devoted to 1U, and that at the time of summary judgment there were "no full time resources devoted" to the project. In its answers to Lewitton's interrogatories, ITA described the development of 1U as being "significantly scaled back," and admitted that work was still being done on the project to protect ITA's investment in the program. ITA points to no evidence supporting its new characterization of the program as having been "terminated." Its repeated description of the program as having been "scaled back" or "reduced" is consistent with the conclusion that the project was delayed rather than terminated. There simply is no evidence pointing to a genuine dispute that a fact finder must resolve.

Finally, ITA argues that even if the contract entitles Lewitton to the additional 104,178 options, we must remand this case to the district court to determine whether the options are valid. According to ITA, the validity of Lewitton's options turns on Delaware law (ITA is a Delaware corporation), which requires any instrument granting a stock option to specify the period of time in which the options must be exercised. ITA points out that the district court's judgment does not say when Lewitton must exercise the options. ITA thus concludes that a remand is necessary to determine whether "those options must be exercised within ninety days, or some other defined period of time, or are invalid altogether."

ITA's request for a remand is puzzling given its agreement—memorialized by the district court in an agreed order—that in the event the court found Lewitton was entitled to exercise more than 34,722 shares, ITA would not argue that the options were invalid because they were not exercised within 90 days of his termination. By assenting to the agreed order, ITA waived any right to raise that argument on appeal. *See Repa v. Roadway Exp., Inc.*, 477 F.3d 938, 942 (7th Cir. 2007) (noting that waiver is the intentional abandonment of a known right). ITA further agreed that "the district court's order will determine how and when Mr. Lewitton may purchase any or all of the Disputed Shares." The court failed to specify a date by which Lewitton must exercise his remaining options, but there is nothing in the agreed order saying that the judgment must conform to ITA's view of Delaware law. Instead of filing a motion to correct the judgment pursuant to Federal Rule of Civil Procedure 59(e), ITA

requests a remand for the district court to resolve a hypothetical conflict that may arise if ITA refuses to allow Lewitton to execute the district court's judgment by exercising his options. Should that day arrive, Lewitton may look again to the courts to resolve the conflict.

The judgment of the district court is AFFIRMED.