In the

# United States Court of Appeals
### For the Seventh Circuit

Nos. 07-2766 & 07-2821

RICHARD CURIA,

*Plaintiff-Appellee,*

*v.*

KENNETH A. NELSON,

*Defendant-Appellant.*

Appeals from the United States District Court
for the Northern District of Illinois, Western Division.
No. 05 C 50094—**Philip G. Reinhard**, *Judge.*

Nos. 07-2767 & 07-2820

KENNETH A. NELSON,

*Plaintiff-Appellant,*

*v.*

RICHARD CURIA,

*Defendant-Appellee.*

Appeals from the United States District Court
for the Northern District of Illinois, Western Division.
No. 05 C 2585—**Philip G. Reinhard**, *Judge.*

ARGUED OCTOBER 27, 2008—DECIDED NOVEMBER 20, 2009

Before KANNE, WILLIAMS, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*.    Kenneth Nelson and Richard Curia dispute the terms of a stock purchase agreement the two entered into in 1989 and then modified several times over the next decade. In the 1989 agreement, Nelson sold Curia a small number of shares in two automobile dealerships; the contract also gave Curia a series of options to purchase all remaining shares pursuant to a defined valuation formula. A 1993 modification of the agreement contains language suggesting that the parties terminated Curia's options and specified instead that his right to purchase additional shares was left to future agreement of the parties. Other language in this and subsequent modifications, however, also suggests that Curia's option to purchase additional shares in one of the dealerships may have survived the 1993 modification. The district court granted summary judgment in Curia's favor after concluding that the contract and its modifications, read together, unambiguously gave Curia the option to purchase the remaining shares in one of the dealerships.

We reverse. The contract as modified is reasonably susceptible to both parties' interpretation and is therefore ambiguous regarding the survival of the options. Accordingly, extrinsic evidence is required to clarify what the parties meant, and summary judgment compelling the sale of shares was inappropriate.

## I. Background

In 1989 Kenneth Nelson and Richard Curia entered into a stock purchase agreement providing that Nelson would sell Curia a minority block of shares in two automobile dealerships, Ken Nelson Pontiac-GMC, Inc. (known as "Auto Plaza"), and Ken Nelson Nissan, Inc. (known as "Auto Mall"). Prior to the agreement, Nelson owned all 8,180 shares of outstanding capital stock in Auto Plaza and all 1,200 shares in Auto Mall. Paragraph 1 of the agreement provided that Curia was to pay Nelson $100,000 in exchange for 1,000 shares of Auto Plaza and 144 shares of Auto Mall. Paragraph 4 of the agreement, titled "Options to Purchase Additional Shares," gave Curia three options to purchase additional stock in the two corporations. The first option gave Curia the right to purchase an additional 1,000 shares of Auto Plaza and 144 shares of Auto Mall for $100,000. The second allowed Curia to purchase a 49% stake in both corporations by acquiring 2,009 shares of Auto Plaza and 300 shares of Auto Mall. The final option gave Curia the right to acquire all remaining shares in the two corporations provided he "also offer[ed] to purchase the land and four buildings of [Auto Plaza]." Rather than specify a price, Paragraph 4 of the 1989 agreement set forth a valuation formula for the latter two options.

Some time passed before Curia could complete the initial transaction, apparently because he encountered some difficulty borrowing the funds necessary to make the initial $100,000 purchase and to exercise the first $100,000 option. After some delay he secured a $200,000

loan, and in 1990 he purchased the shares specified in the initial transaction and exercised the first of the options. By this time, however, the number of shares in the two corporations had changed—Auto Plaza now had 10,000 outstanding shares and Auto Mall now had 1,500. Nelson transferred 2,000 shares in Auto Plaza and 300 shares in Auto Mall to Curia.

In 1993 the parties decided to modify their original agreement. The reason for the modification is not entirely clear, although it appears to relate to the change in the number of shares in the corporations. The preamble to the 1993 modification offers some additional explanation. The recitals in the modification agreement state that Nelson and Curia had made a "mutual mistake . . . in determining the fair market value of the capital stock [of Auto Plaza and Auto Mall] and in evaluating the minority interest" the parties had intended. Accordingly, the parties stated their intention to "modify the [1989 agreement] to reflect the re-evaluation of the minority interest . . . and to correct the mutual mistake of the parties." The recitals also lay out the revised per-share price that should have applied in 1989 to achieve the intended minority interest. Exhibit A to the modification shows that the parties calculated the intended price by applying a revised valuation formula and then discounting the share price by 30%.

The 1993 modification also included the following language in Paragraph 5, titled "Purchase of Additional Shares":

> Curia shall have the right to purchase additional shares of stock in said corporations *upon those terms*

*and conditions subsequently agreed upon by the parties* hereto. The purchase price for said additional shares of stock shall be determined by adding to the total net worth of each corporation a figure representing the accumulated LIFO (last in first out) reserve and dividing the total sum thereof by the number of shares of each corporation.

(Emphasis added.) The parties dispute the effect of Paragraph 5—particularly its first sentence—on the options contained in the 1989 agreement. Nelson believes the first sentence rendered the remaining options in the 1989 agreement inoperative. Curia argues that whatever that sentence means precisely, the modification agreement read as a whole makes it clear that the parties intended to maintain his option to purchase all remaining shares. The second sentence of Paragraph 5 sets forth a valuation formula for any of the "said additional shares." That formula differs from the one applicable to the options provided for in the 1989 agreement and matches the formula used in the 1993 modification to calculate the book value of shares in the two companies as of 1989. Curia maintains that the presence of this modified valuation formula means that his option to purchase all remaining shares survived the 1993 modification.

Nelson and Curia entered into two subsequent modification agreements, one in 1997 and one in 2000. The district court held, and the parties now agree, that the 1997 agreement—which involved a third party's purchase of stock—effectively terminated any remaining

right that Curia might have possessed to purchase any additional shares in Auto Mall. The 2000 modification, entitled "Amendment to Modification Agreements," was the last of the parties' modification agreements. One evident purpose for this final modification was to memorialize the parties' intent with respect to share transfers in the event that either party died. According to this last modification, Curia would "immediately purchase" from Nelson 400 shares of stock in Auto Plaza in the event that Nelson died while the 1989 agreement and the 1993 modification were still "in force." The parties also modified the valuation formula that would apply should the parties need to calculate "[t]he purchase price of the 400 shares of stock and the remaining 7600 shares of stock." This valuation formula differed from both the one stated in the 1993 modification and the one stated in the 1989 agreement. This modification further explained that in the event that Curia died first, Nelson would repurchase Curia's stock according to the new formula. Finally, the modification stated that if Nelson died first, Curia agreed to provide compensation to Nelson's relatives and estate "until such time as Curia purchases all of the remaining shares of Nelson's stock."

In 2004 the parties began discussing Curia's buyout of Nelson's interest in the corporations. Apparently these discussions stalled, and in March 2005 Curia notified Nelson that he was exercising the second option under the 1989 agreement to acquire the shares necessary to give him control over 49% of the outstanding capital

stock in the corporations. Curia included in this letter his own calculation as to the number of shares he was purchasing. He also noted that he was exercising his option "pursuant to Section 4 of the [1989 agreement] . . . for the consideration and upon the terms set forth in the [1989 SPA] and the [1993 modification]." A day after sending this notice, Curia sent another notice to Nelson saying that he intended to exercise his option to purchase all remaining shares in Auto Plaza and Auto Mall.

Nelson immediately contested Curia's right to purchase the shares, claiming that the options were no longer valid. In April 2005 Nelson filed a declaratory judgment against Curia seeking a ruling that Curia did not have the right to exercise either option. This led to a counter-suit by Curia claiming Nelson breached the parties' agreement to sell him the shares pursuant to the 1989 options, as modified by the later agreements. The suits were consolidated, and in a series of orders, the district court granted Curia's motion for summary judgment to compel the sale of all remaining stock in Auto Plaza, holding that the 1989 agreement as modified in 1993 and 2000 unambiguously granted Curia the right to exercise the options specified in Paragraph 4 of the 1989 agree-ment. Regarding the purchase price for the Auto Plaza shares, the court concluded that the valuation method intended by the parties was the one mentioned in the 2000 modification. Although other collateral disputes remained, the court made findings and entered an order pursuant to Rule 54(b) of the *Federal Rules of Civil*

*Procedure* directing entry of a final judgment on these claims.[1]

## II. Discussion

We review a grant of summary judgment de novo. *Tingstol Vo v. Rainbow Sales, Inc.*, 218 F.3d 770, 771 (7th Cir. 2000). The central issue on appeal is whether Curia's option to purchase all remaining shares in Auto Plaza, as provided in the 1989 agreement, survived the 1993 modification. Illinois law applies to this dispute. In Illinois, as in other states, if a contract is unambiguous, the court will enforce it as written, without resorting to extrinsic evidence. *See, e.g.*, *Farm Credit Bank v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991); *see also Lewitton v. ITA Software, Inc.*, No. 08-3725, 2009 WL 3447425, at *4 (7th

---

[1] Among the remaining issues in the litigation are, for example, Curia's right to certain real estate, personal property, and the "Ken Nelson" name; liability for an accounting firm's bill; certain post-closing indemnification obligations; and whether Nelson's wife was entitled to a Cadillac for fifteen years following the sale of stock. In its Rule 54(b) ruling, the district court determined that the claim regarding the survival of Curia's option to purchase additional shares in the corporations was independent of any of the remaining claims in the litigation "with no material overlap between this issue and any remaining issues." More specifically, the court held that "[t]he purchase of the shares is . . . a stand alone issue that is significant involving several million dollars[,] and the resolution of this issue on appeal now will materially aid in the ultimate resolution of the entire action."

Cir. Oct. 28, 2009). Here, no one argues that the contract as modified is ambiguous. Rather, Nelson and Curia both claim the contract is unambiguous and we may interpret and apply it as a matter of law; they disagree about what it means. It is well established, however, that a contract is not unambiguous just because both parties say so, nor is a contract ambiguous simply because the parties offer different interpretations of its language. *See Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 214 (Ill. 2004). "[A] contract is not necessarily unambiguous when, as here, each party insists that the language unambiguously supports its position. Rather, whether a contract is ambiguous is a question of law." *Id.* We are therefore not bound by the parties' mutual assertion that the contract is unambiguous.

Accordingly, the threshold question for us is whether the contract as modified is ambiguous regarding the continued existence of Curia's option to purchase additional shares in Auto Plaza.[2] We think that it is. The question of contract ambiguity turns largely on whether the contract language is "reasonably susceptible to more than one meaning," *Susmano v. Associated Internists of Chi., Ltd.*, 422 N.E.2d 879, 882 (Ill. App. Ct. 1981), although ambiguity may also exist where the language used is "obscure in meaning through indefiniteness of expres-

---

[2] As we have noted, the district court held that any continuing right to purchase additional shares in Auto Mall was effectively terminated by the 1997 agreement. Curia does not challenge that holding on appeal.

sion," *Platt v. Gateway Int'l Motorsports Corp.*, 813 N.E.2d 279, 283 (Ill. App. Ct. 2004); *see also Lewitton*, 2009 WL 3447425, at *4 ("A contract is ambiguous if its terms are indefinite or have a double meaning."). A contract is to be "construed as a whole, viewing each part in light of the others." *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007).

> In construing contracts, to determine their intent, it is long established that a construction should be adopted, if possible, which ascribes meaning to every clause, phrase and word used; which requires nothing to be rejected as meaningless, or surplusage; which avoids the necessity of supplying any word or phrase that is not expressed; and which harmonizes all the various parts so that no provision is deemed conflicting with, or repugnant to, or neutralizing of any other.

*Coney v. Rockford Life Ins. Co.*, 214 N.E.2d 1, 3 (Ill. App. Ct. 1966). But if the contract is ambiguous, "its construction is then a question of fact, and parol evidence is admissible to explain and ascertain what the parties intended." *Farm Credit Bank*, 581 N.E.2d at 667.

Nelson argues that the 1993 modification rendered the options in the 1989 agreement inoperative by conditioning all additional stock transfers on the subsequent agreement of the parties. This is the plain meaning of Paragraph 5 in the 1993 modification, he claims, and for support he points to the paragraph's heading— "Purchase of Additional Shares"—as well as its first sentence. That sentence says: "Curia shall have the right to purchase additional shares of stock in said corpora-

tions upon those terms and conditions subsequently agreed upon by the parties hereto." Nelson argues that this language is plainly inconsistent with the options provision in the 1989 agreement, and therefore the options are no longer a part of the parties' agreement.

Curia counters that the contract read as a whole supports the continued existence of his right to purchase the remaining shares, irrespective of how the court interprets the first sentence in Paragraph 5. He maintains that Nelson's interpretation is unreasonable because nothing in the contract explicitly purports to terminate the options whereas several provisions in the 1993 and 2000 modifications suggest that the right to purchase the remaining shares survived the 1993 modification. Indeed, he reads the disputed language in Paragraph 5 to unambiguously *confirm* his right to purchase all remaining shares while leaving only nonmaterial terms to subsequent agreements.

We cannot agree with the parties' premise that the contract is unambiguous on the issue of the survival of Curia's options. The contract and its various modifications reasonably can be read in the manner urged by Nelson *or* in the manner urged by Curia. Curia attacks Nelson's interpretation on multiple grounds, and we address his arguments first. Curia maintains that Paragraph 5 of the 1993 modification contains no express statement of intent to terminate the options provision of the 1989 agreement and therefore the later agreement did not extinguish his options. He also argues that terminating the options was beyond the

scope of the parties' intent in modifying the 1989 agreement, as evidenced by the recitals to the 1993 modification, which list several reasons for the modification but say nothing about canceling the options. We disagree that these factors unambiguously establish that the options survived.

A contract modification is a "change in one or more respects which introduces new elements into the details of the contract and cancels others but leaves the general purpose and effect undisturbed." *Int'l Bus. Lists, Inc. v. Am. Tel. & Tel. Co.*, 147 F.3d 636, 641 (7th Cir. 1998) (citing *Downers Grove Assocs. v. Red Robin Int'l, Inc.*, 502 N.E.2d 1053, 1060 (Ill. App. Ct. 1986)). Once modified, an original contract remains in force only to the extent that it is not modified by the new agreement. "A modified contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract." *Schwinder v. Austin Bank of Chi.*, 809 N.E.2d 180, 189 (Ill. App. Ct. 2004).

In this case, although the 1993 modification does not explicitly cancel the option provisions, Paragraph 5 could reasonably be read in a way that is inherently inconsistent with the continued existence of those options, which in turn could mean that the 1993 modification effectively terminated the options. The first sentence of Paragraph 5 conditions the purchase of additional shares on a *subsequent* agreement between the two parties. This can fairly be read as incompatible with the continued operation of the 1989 agreement options, which

conditioned future share transfers on the *previous* agreement of the parties. Accordingly, we cannot accept Curia's argument that the 1993 modification necessarily required a more express statement to be understood as a termination of the 1989 options.

Curia also argues that Nelson's interpretation improperly reads the first sentence of Paragraph 5 in isolation; he claims that when the contract and its modifications are read as a whole, Nelson's interpretation is unreasonable. To support this alternative argument, Curia focuses first on the second sentence of Paragraph 5, which sets a valuation formula for subsequently agreed-upon share transfers. He argues that it would make little sense for the parties to agree in 1993 on a valuation method for additional shares but wait until a later date to determine the other terms of a share transfer. The district court agreed with this reasoning, concluding that "[i]t defies reason . . . that the parties would provide a mechanism for determining the purchase price but intend it to kick in only if they subsequently agreed on other terms and conditions."

We agree that this language casts doubt on Nelson's interpretation, but it does not necessarily make it implausible or unreasonable. The serial modifications of the 1989 agreement at best establish that the parties continuously revisited and revised their understanding of the proper method for valuing shares in the corporations; the valuation formula for additional shares under the 1989 agreement differs from the formula used in Paragraph 5 of the 1993 modification, and the 1993

formula in turn differs from the one in the 2000 modification. Indeed, the stated purpose of the 1993 modification was to correct "a mutual mistake . . . in determining the fair market value" of Plaza shares. It is not implausible that the parties agreed in 1993 to eliminate the prior options and replace them with a different agreement about subsequent share transfers while at the same time settling on a valuation formula for those shares that they believed would accurately reflect book value.

We also reject Curia's argument that other language in the contract, read as a whole, makes Nelson's interpretation of the modified contract unreasonable. It is true that several provisions in the 1993 and 2000 modifications appear to anticipate Curia becoming a majority shareholder in one or both corporations at some point. For instance, the 1993 agreement modifies a provision in the 1989 agreement giving Nelson the right to repurchase Curia's shares under certain circumstances. The new version of this provision says that Nelson's right to repurchase "shall become null and void at the time Curia becomes a majority stockholder in both of said corporations." However, the reference to Curia as "majority stockholder" can reasonably be understood as conditioned on subsequent agreement of the parties, as reflected in the language of the first sentence of Paragraph 5. In addition, although the 2000 modification generally refers to the 1989 agreement as being "in force," this does not unambiguously indicate that the parties specifically intended that the *options* provision of the 1989 agreement remained "in force," particularly in light of language in Paragraph 5 of the 1993 modification

conditioning additional share purchases on the sub-
sequent agreement of the parties.

Nor is Nelson's interpretation of the contract unrea-
sonable based on some sort of fundamental unfairness
to Curia. Illinois law avoids interpretations that render a
contract "inequitable, unusual, or such as reasonable
men would not be likely to enter into." *NutraSweet Co. v.
Am. Nat'l Bank & Trust Co.*, 635 N.E.2d 440, 444-45 (Ill. App.
Ct. 1994); *see also* 11 RICHARD A. LORD, WILLISTON ON
CONTRACTS § 32:11 (4th ed.). We have said that "[o]ne
thing to consider is the consequences of alternative inter-
pretations. Suppose that the result of reading a contract
in a particular way is that one of the parties assumed
enormous risks and got nothing in return; this would
argue against the reading." *Alliance to End Repression v.
City of Chicago*, 742 F.2d 1007, 1013 (7th Cir. 1984). This
principle is not implicated here. Nelson's interpretation
of the modified contract does not compel unreasonable
performance from Curia or create a situation in which
Curia's performance under the 1989 contract yielded
nothing in return after the modifications. *See, e.g., Tishman
Midwest Mgmt. Corp. v. Wayne Jarvis, Ltd.*, 500 N.E.2d
431, 435 (Ill. App. Ct. 1986) (rejecting interpretation that
would require one party to pay legal fees twice); *Camp
v. Hollis*, 74 N.E.2d 31, 35 (Ill. App. Ct. 1947) (rejecting
interpretation requiring commission payment even if
the other party played no role in securing a sale).

At the same time, Curia's interpretation of the con-
tract and its modifications is also reasonable. As we
have noted, both the 1993 modification and the 2000

modification contain language at least suggesting a continued right to purchase the remaining shares in some form. The language in Paragraph 5 of the 1993 modification can reasonably be understood to preserve Curia's "right" to purchase "additional shares" in Auto Plaza pursuant to the valuation formula stated in that paragraph, subject to future agreement of the parties on other non-price terms. Although the 2000 modification altered the valuation formula, the parties' shifting agreement on the proper share-valuation method does not necessarily defeat the continued existence of the options.

Where, as here, there is more than one reasonable way to read the parties' contract, it is not our role to choose among the competing reasonable interpretations. We simply cannot tell from the contract documents alone whether the parties intended the original options to survive through the 1993 and 2000 modifications. The contract as modified is ambiguous, and the ambiguity can only be clarified by reference to extrinsic evidence of the parties' intent. Summary judgment compelling the sale of the remaining shares in Auto Plaza was therefore inappropriate. We REVERSE the district court's judgment and REMAND for further proceedings consistent with this opinion.