2023 IL App (1st) 220051-U

THIRD DIVISION
March 22, 2023

No. 1-22-0051

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *IN RE* MARRIAGE OF | ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| WENDY BATTAGLIA, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 2019 D 003197 |
| | ) | |
| MARK BATTAGLIA, | ) | |
| | ) | Honorable James Shapiro, |
| Respondent-Appellant. | ) | Judge, presiding. |

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice McBride and Justice Burke concurred in the judgment.

**ORDER**

¶ 1    *Held:*   The circuit court did not err in reforming the parties' marital settlement agreement that had attributed a marital debt to the wrong creditor. Affirmed.

¶ 2    Petitioner-appellee Wendy Battaglia and respondent-appellant Mark Battaglia entered into a marital settlement agreement (MSA), which the trial court approved prior to entering an order dissolving their marriage. Wendy subsequently filed a motion to modify the MSA to correct the creditor bank of one of the parties' marital debts. Following a hearing, the court granted Wendy's

motion and modified the MSA accordingly. Mark now appeals, contending that the court held a legally insufficient hearing. We affirm the judgment of the circuit court.

¶ 3                                    BACKGROUND

¶ 4      On April 9, 2019, Wendy filed her verified petition for dissolution of marriage. Wendy's petition indicated that she and Mark were married on July 13, 2007, and that she and Mark had no children together. Wendy alleged irreconcilable differences as grounds for dissolution. Mark filed his appearance and *pro se* response on May 22, 2019.

¶ 5      On August 13, 2020, Mark filed a "Combined Petition for Temporary Restraining Order, Restoration of Marital Funds, Modification of a Temporary Order, and Sanctions." Count I of Mark's combined petition alleged, *inter alia*, that his signature on a $40,000 loan application to Consumers Credit Union (Consumers)—which Consumers later approved—was forged. In count III of his petition, Mark asked the trial court to order Wendy to use any remaining funds in the Consumers accounts to repay the loan and to repay Mark for the payments he made on the loan from August 2019. In pertinent part, Wendy's answer denied Mark's allegation that she forged his signature and affirmatively stated that Mark was actively involved in the application process and worked with two bank representatives. Wendy's answer further noted that they used "some of the money for the down payment on the parties' office space, for which they put down approximately $40,000."

¶ 6      On October 9, 2020, the court issued an order on Mark's combined petition. The order stated that the court heard the parties' arguments and was "fully informed in the premises." After

noting that Mark had withdrawn count I without prejudice, the court denied count III of Mark's petition in part, directing Mark to "continue to repay the loan from Consumers Credit Union."[1]

¶ 7    On May 20, 2021, the parties entered into a marital settlement agreement (MSA). The preamble of the MSA indicated in part that Mark and Wendy "consider it to be in their best interests to fully settle [their] rights of property ***." Article II of the MSA, entitled "Property Settlement," provided in relevant part that Wendy would be awarded their home and would be solely responsible for the mortgage on the property. In addition, Mark would be awarded the "Office Property" located at 2417 West Madison Street in Chicago and would be solely responsible for the mortgage on that property.

¶ 8    Article V, entitled "Debts," stated that the parties incurred "various debts, liabilities, and obligations" during the marriage that had not been satisfied. The article further stated that the debts "include, but are not limited to, the following: a personal loan from [Mark's] parents, a debt resulting from [Mark's] campaign for judge, and credit card debt." The article further includes a table with the title "Assignment of Marital Debt." Among the entries on the table include a $9,000 amount owed to a creditor listed as "1st Eagle Bank Line of Credit [sic]."

¶ 9    Subparagraph 4 of paragraph B of this article stated in part that Mark would pay the debt on the "revolving line of credit on the Office Property" and that he would indemnify Wendy "against the revolving line of credit and any costs or fees arising out of a nonpayment of that loan, including any attorney[] fees incurred in regard to nonpayment." Subparagraph 5 provided that if either Mark or Wendy failed to pay the debts assigned to them, they agreed to "indemnify one

---

[1] The court granted that portion of Mark's prayer for relief in count III asking that Wendy be responsible for paying the assessments on their townhome.

another for the debts assigned to each of them individually," including attorney fees and court costs.

¶ 10    Paragraph E of Article XI, "General Provisions," stated that (1) the MSA contained "the whole and entire agreement" made between Mark and Wendy, (2) Mark and Wendy had examined the MSA, (3) they each understood "the provisions and covenants contained therein," (4) they believed the MSA to be "fair, just, and equitable with respect to each of them," and (5) they each were "fully and completely satisfied with the terms, provisions, and covenants thereof."

¶ 11    On May 21, 2021, the trial court held a prove-up hearing via videoconference.  Wendy testified on direct examination that she and Mark were married on July 13, 2007, in Cook County, and that they had no children born to or adopted by them during the marriage.  Wendy added that, due to irreconcilable differences, she and Mark separated around December 28, 2018.  Wendy agreed that, pursuant to the MSA, she would keep their personal residence and refinance the mortgage so that it is "free and clear" from Mark.  Wendy further stated that Mark would keep the office property located at 2417 West Madison Street, Unit 1, free and clear from her and that he would "refinance the mortgage on that property to remove [her] from that mortgage."  With respect to the debts, Wendy confirmed that she would pay various credit card balances as well as one-half of Mark's debt incurred for his campaign for a judgeship and one-half of a debt owed to Mark's parents.  The following exchanges then took place:

"Q.  [(MS. McMULLIN) (WENDY'S ATTORNEY)]:  Mr.

Battaglia will pay *** the debt or, excuse me, pay the line of credit

at First Eagle Bank?

A.  [(WENDY)]:  It's at Consumer Bank.

Q.  Is that the Consumer[s] Credit Union?

A. Yes.

Q. Mr. Battaglia will pay the outstanding balance on the water bill?

A. Yes, and the balance of that other account was 9,000.

Q. Returning to the question about the line of credit, is that what you're referring to?

A. Yes.

I didn't hear the balance. That's fine.

Q. The balance is approximately $9,000."

Wendy's attorney noted that the balance on the line of credit was approximately $9,000. Wendy then confirmed that she was represented by Legal Aid Chicago, and was asking the court to waive the cost of producing a transcript of the proceedings. There was no cross-examination.

¶ 12    Mark then testified on direct examination that he was an attorney, and when asked whether, "as an attorney," he reviewed the MSA and fully understood all of its terms, he responded, "Correct." He further confirmed that he intended to be bound by the terms of the MSA and that he was satisfied by all of its terms. Mark's attorney then asked whether he heard the questions that were posed to Wendy and her answers. Mark, however, responded that he was "distracted" and admitted that he did not hear "for the most part" the questions and answers regarding Wendy's testimony. Mark further confirmed that the table in the MSA "outline[d] all of your respective debts that you've agreed to take on." Mark further stated he was "satisfied with taking on those debts." There was no cross-examination of Mark's testimony.

¶ 13    At the conclusion of the testimony, the trial court announced its findings. The court recounted that Mark and Wendy were married on July 1, 2007, that they had no children, the

residency requirements were met, and that they had lived apart since 2018. The court further found that (1) the grounds of irreconcilable differences were proven; (2) the terms of the MSA were fair, reasonable, and not unconscionable; and (3) the parties entered into the MSA "freely and voluntarily." The court then awarded a judgment for dissolution of marriage between the parties. The court stated that the MSA would be incorporated into the judgment, and that, except as provided in the MSA, Mark and Wendy would be awarded the property in their respective names, possession, and control. The court then stated, "Each party shall be responsible for their own debts as provided in the agreement and as indicated on the record."

¶ 14    On July 13, 2021, Wendy filed a motion to "modify" the MSA to "correct a typographical error." In her motion, she stated that the parties took out a $40,000 loan from Consumers prior to separating and petitioning for divorce, and until their separation, the parties paid the monthly loan amount of $702. Wendy then made the monthly payments until August 2019, when the court ordered Mark to make those payments. Wendy stated that, on the date the court entered judgment dissolving their marriage (May 21, 2021), the Consumers loan had an approximate $9,000 balance. A statement attached to the motion purportedly from Consumers indicated a balance of $9,011.21.[2] Wendy further stated that she understood Mark's settlement offer to be that Mark would pay the remaining balance on this loan. Wendy noted that the MSA indicates that, on page eight, the $9,000 debt is allocated entirely to Mark.

¶ 15    Wendy then stated that the MSA erroneously listed the creditor for this loan as "First Eagle Bank" (First Eagle) instead of Consumers. Wendy explained that the parties only had one account

---

[2] Wendy did not move to submit this statement into evidence. We note that exhibits to pleadings are not evidence. *In re Marriage of Budorick*, 2020 IL App (1st) 190994, ¶ 73 n.3 (citing *Jill Knowles Enterprises, Inc. v. Dunkin*, 2017 IL App (2d) 160811, ¶ 21).

at First Eagle for the mortgage on Mark's office. Wendy's motion also included a letter from First Eagle stating that this loan had a balance of $68,983.60 as of June 30, 2021.[3] Wendy's motion further noted that, at the prove-up hearing, Wendy testified that the creditor name was incorrect and should instead read "Consumer[s] Credit Union."

¶ 16    Wendy argued that Mark's claim that he did not agree to the Consumers loan was "illogical." Wendy first noted that the mortgages for the home and the office were addressed in article II of the MSA ("Property Settlement"), whereas the Consumers loan was addressed in article V ("Debts"). Wendy then pointed out that Article V of the MSA listed the debt as carrying a $9,000 balance, which is near the actual balance, whereas the First Eagle mortgage "carries approximately a $68,000" balance. Wendy argued that the $9,000 balance could not have been interpreted to represent the mortgage balance, and the parties had no other $9,000 debt. Wendy added that the stated intent of the judgment was to "dissolve [*sic*] all property and debts" of the parties, and since the debt is allocated to Mark and not Wendy "in any way," he could not have interpreted the MSA such that Wendy would be responsible for the debt. Finally, Wendy argued that assigning the Consumers loan to Mark would create an equitable division of their marital debts and assets, explaining that Mark would end up with $228,000 of assets less $42,000 of debt (including the loan at issue) whereas Wendy would end up with $200,000 of assets less $56,000 of debt. Wendy added that Mark assuming the $9,000 loan would further offset Wendy assuming approximately $10,000 in credit card debt that had been incurred prior to their separation.

---

[3] As with the statement purportedly showing the Consumers balance, Wendy did not move to submit this statement into evidence either. Since exhibits to pleadings are not evidence, we do not consider either document here. See *Budorick*, 2020 IL App (1st) 190994, ¶ 73 n.3

¶ 17    Wendy asked the court to modify the judgment to reflect that the creditor for the $9,000 debt is Consumers and not First Eagle.  In the alternative, Wendy stated that the court's August 15, 2019, order (requiring Mark to make the payments) would govern.

¶ 18    On September 21, 2021, the trial court held a hearing on Wendy's motion via videoconference on the Zoom software platform.  Wendy's attorney argued, in essence, that the MSA incorrectly listed the name of the creditor for a $9,000 debt that was in fact owed to Consumers.  She added that (1) the joint loan was used in part for renovations on Mark's office; (2) Wendy continued making the payments individually upon their separation; and (3) around August 2019, the court ordered Mark to make the monthly payments going forward.  Wendy's attorney noted that Mark, however, did not make a payment "at the beginning of May," which resulted in the money for the payment being directly debited from Wendy's personal savings account.  Wendy's attorney then asked the court to "create an equitable division" and allocate to Mark a larger share of a loan that was owed to Mark's parents.

¶ 19    At that point, Mark interrupted the proceedings, telling his attorney, "[Y]ou've got to object to this at some point."  The following then took place:

> "THE COURT:  Mr. Battaglia, you have a lawyer, okay?
>
> MR. BATTAGLIA:  I'd like to speak to him.  Rafael, can you give me a call?  I'd like to talk to you about—
>
> MR. VARGAS [(MARK'S ATTORNEY)]:  Judge, I— Mark—
>
> THE COURT:  No, sir.  Now is not the time to do that, so—
>
> MR. VARGAS:  Mark—
>
> THE COURT:  —I'm going to—

> MR. VARGAS: She's just reiterating everything she's already alleged, and the Judge has already read the pleadings.
>
> THE COURT: So what do you want to tell me, Mr. Vargas?
>
> MR. VARGAS: Judge, I'm going to be brief as—I'm sorry—the timing—"

The court then responded, "I'll believe that when I see it but go ahead."

¶ 20    Mark's attorney then argued that Wendy's attorney filed an "improper motion" and that, since Wendy drafted the MSA, any ambiguities should be construed against her. Mark's attorney further argued that Mark agreed that he would assume all debt related to the "office condo" but that the line of credit was not "in any way" related to the office condo. The court noted that Mark agreed to take on the $9,000 debt but there was no "First Eagle line of credit for $9,000." Mark's attorney stated that Mark had agreed to take on the First Eagle debt, the balance of which according to the court was "just under $69,000."

¶ 21    The court then noted that Mark was "vigorously shaking his head no." Mark's attorney asked to call him as a witness, which the court allowed. The following exchanges then took place:

> "MS. MCMULLEN: Let me respond, Your Honor, before we call witnesses. I think that the issue is that there was a mortgage on the office, which we are all agreeing to; and that mortgage was— I believe it was 68,000 at the time of the entry of this judgment. I may be off a little bit, but I believe that that is—the statement that I received from Mr. Vargas, and so the issue becomes: Who was paying this $9,000? It was our interpretation from settlement

9

conversations that this would be Mr. Battaglia, and then I can acknowledge—

MR. VARGAS: Not at all, Judge. Not at all.

MS. MCMULLEN: Okay.

MR. VARGAS : All of the settlement discussion and documents all say—

MS. SULLIVAN [(WENDY'S CO-COUNSEL)]: If you'll allow—if you'll allow [Ms. McMullen] to—

MR. VARGAS: Counsel, are—

MS. SULLIVAN: If you'll allow [Ms. McMullen] to continue?

THE COURT: Yeah, Ms. Sullivan.

Yeah. I don't like the interruptions, okay?

Ms. McMullen, were you finished or were you not?

MS. MCMULLEN: I was not finished, Your Honor. Thank you.

THE COURT: Okay. Mr. Vargas, *** maybe you could just not talk and let her finish, okay? I'm going to mute you now until she's finished."

Wendy's attorney then argued in pertinent part that, during the settlement discussions, Wendy would assume the credit card debt, and Mark would assume the $9,000 line of credit "because these were just about an even split." Wendy's attorney added that this was their intention. The trial court then told Mark's attorney, "You can unmute yourself now" and asked for his response.

¶ 22    Mark's counsel initially argued that, although Wendy testified at the prove-up hearing that the $9,000 debt was to Consumers and not First Eagle, Mark "did not confirm that" when Mark testified.   The court then admonished the parties to refrain from "talk[ing] over each other," explaining that it "doesn't work on Zoom, and it doesn't work with the court reporter."  The court then allowed Mark's counsel to call Mark as a witness.

¶ 23    Mark then testified that, in an initial draft of the MSA, he asked his attorney to have the name of the creditor for the $9,000 debt changed from "office line of credit" to "First Eagle Bank." Mark explained that there was $69,000 debt at First Eagle, so he assumed that Wendy's attorney, who drafted the MSA, erroneously "left out the six."  Mark said he asked his attorney to replace the $9,000 figure with $69,000 and change the creditor name to First Eagle.  Mark added, "I at least got the First Eagle Bank, and I thought that was good enough."  He then stated, "I never ever, ever intended to take on the debt at Consumers Credit Union.   That would have collapsed negotiations, and we would have went [*sic*] to trial."  Mark reiterated that Wendy took out the loan without his knowledge and by forging his name.  Mark also denied that the line of credit was used to pay for the office.  Mark's counsel then stated that, based upon Mark's testimony, the scrivener's error concerned "the number, not the actual bank itself, because it's the only bank that's affiliated with the office condo."

¶ 24    At that point, the trial court stated that it was making a credibility determination that Mark's testimony was not credible, and it was "ruling in favor of [Wendy] on this issue."  On that same day, the trial court issued a written order stating in part, "The Judgment of Dissolution of Marriage is reformed so that line number seven of the chart on page [eight] reads 'Consumer[s] Credit Union' instead of '1st Eagle Bank Line of Credit' as the creditor associated with the $9,000.00

debt." The court further ordered that, since Wendy had already paid the debt, Mark would assume an additional $9,000 of Wendy's share of their debt to Mark's parents.

¶ 25    On October 18, 2021, Mark filed his *pro se* motion to reconsider the trial court's order. Mark argued that the court misapplied the law regarding (1) contract reformation, (2) scrivener's errors, and (3) contract interpretation. Mark further argued that the court's findings of fact were against the manifest weight of the evidence, the court granted relief "outside the scope of the [m]otion," abused its discretion, and used the incorrect standard of proof in reviewing the evidence.

¶ 26    On January 6, 2022, the trial court held a hearing on Mark's *pro se* motion. The record does not, however, contain a report of proceedings, or acceptable substitute, for that hearing. On January 7, 2022, the trial court entered a written order denying Mark's motion. The order, which initially stated that it was "duly advised in the premises," determined that the creditor bank for the $9,000 line of credit, which was listed as "First Eagle Bank" in the MSA, was a scrivener's error. The court explained that it would be illogical for the MSA to include a second (nonexistent) debt to First Eagle on page eight of the MSA where there already had been a mortgage to First Eagle listed in the MSA on pages one and two. The court further found that the $9,000 debt, which was owed to Consumers, was intended to be referenced on page eight of the MSA.

¶ 27    The court further found in the alternative that there was clear and convincing evidence that the creditor for the $9,000 debt, which was listed on page eight of the MSA as First Eagle, was a mutual mistake. The court found that the parties' intention was that the creditor for that debt was supposed to be Consumers, "which [Wendy] testified to under oath at the prove-up hearing on May 21, 2021." The court added that, at the time of the judgment, the parties had a joint $9,000 marital debt held by Consumers, and "the evidence established" that the parties intended to assign the repayment of that debt to Mark. The court added that it found Mark's testimony at the hearing

not credible and reiterated, "it would be illogical that a single First Eagle Bank account would be listed twice while one account, the Consumer[s] Credit Union $9,000[] debt, was not included in the [MSA] at all." The court emphasized that it found Mark's testimony "claiming a contrary understanding" not credible. The court then denied Mark's motion to reconsider and ordered the September 21, 2021 order to stand.

¶ 28 On January 10, 2022, Mark filed a *pro se* notice of appeal. He indicated that the orders he was appealing from were dated September 21, 2021, and January 6, 2022. This appeal follows.

¶ 29                                ANALYSIS

¶ 30 On appeal, Mark contends that the circuit court erred in granting Wendy's motion to modify the MSA. Specifically, Mark argues that the hearing on Wendy's motion was "fatally flawed" because the court "did not understand the procedural requirements of a motion to modify a judgment as well as the standard of proof ***."

¶ 31                               Jurisdiction

¶ 32 As a preliminary matter, we need to address this court's jurisdiction. We have an independent duty to consider whether we have jurisdiction and to dismiss an appeal for lack of jurisdiction. *Williams Montgomery & John Ltd. v. Broaddus*, 2017 IL App (1st) 161063, ¶ 32 (citing *Archer Daniels Midland Co. v. Barth*, 103 Ill. 2d 536 (1984)). Rule 301 allows appeals from final judgments as a matter of right. Ill. S. Ct. R. 301 (eff. Feb.1, 1994); see also Ill. Const. 1970, art. VI, § 6. In addition, Rule 303(a)(1) requires a notice of appeal to be filed with the circuit clerk "within 30 days after the entry of the final judgment appealed from." Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017).

¶ 33 A notice of appeal, however, is to be liberally construed. *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 433 (1979). "The notice of appeal serves the purpose of informing the

13

prevailing party in the trial court that the unsuccessful litigant seeks a review by a higher court. Briefs, and not the notice of appeal itself, specify the precise points to be relied upon for reversal." *Id.* Furthermore, "a notice of appeal will confer jurisdiction on an appellate court if the notice, when considered as a whole, fairly and adequately sets out the judgment complained of and the relief sought so that the successful party is advised of the nature of the appeal." *Id.* at 433-34. Finally, "[u]nless the appellee is prejudiced thereby, the absence of strict technical compliance with the form of the notice is not fatal, and where the deficiency in the notice is one of form only, and not of substance, the appellate court is not deprived of jurisdiction." *Id.* at 434.

¶ 34    Here, Mark's notice of appeal indicates that he is seeking review of an order dated "January 6, 2022," and another dated September 21, 2021. There was no order—final or otherwise—dated January 6, 2022, however, and an appeal from the September 21, 2021 order, standing alone, would have been untimely. Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017).

¶ 35    This court has recently upheld our jurisdiction over an appeal that also had an incorrect judgment date on the notice of appeal. In *People v. Hayes*, 2022 IL App (1st) 190881-B, ¶ 17, the defendant-appellant's notice of appeal listed the date of the trial court's judgment from which he was appealing as March 15, 2019, whereas the trial court's order dismissing the defendant's postconviction petition was dated March 8, 2019. We reiterated the rule that we must liberally construe a notice of appeal, and if the defect is one of "form, not substance, failure to strictly comply with the requirements for a notice of appeal is not fatal to jurisdiction." *Id.* (citing *People v. Smith*, 228 Ill. 2d 95, 104-05 (2008)). We then explained that the error was a defect in form and not substance because (1) the circuit clerk's notice of the trial court dismissal was dated March 15, 2019, (2) the notice only referenced the March 8, 2019 order, and (3) incorporated that order by

reference. *Id.* We held that there was no prejudice to the State because the March 8, 2019 order was the only order referenced in the clerk's notice. *Id.*

¶ 36    Here, the trial court's written order denying Mark's motion to reconsider (the order dated September 21, 2021) was dated January 7, 2022, and there are no other orders in the trial court's docket around January 6, 2022.[4] Moreover, the docket of the circuit court reveals only an "Open Call" at 2 p.m. on January 6, 2022, which was the date of the hearing on Mark's motion. Construing Mark's notice of appeal liberally, as we must (*Burtell*, 76 Ill. 2d at 433), Mark clearly intended to appeal the trial court's order dated January 7, 2022. That order denied Mark's motion to reconsider the trial court's order dated September 21, 2021. Both orders centered on whether the MSA should be "reformed" to allocate the $9,000 Consumers line of credit solely to Mark. Mark's brief challenges both the September 2021 order as well as the January 7, 2022, order and nothing else. Since the notice of appeal fairly and adequately sets out the judgment complained of and apprises the appellee (here, Wendy) of the nature of the appeal, appellate jurisdiction is conferred notwithstanding Mark's error in noting the date of the judgment. See *Id.* at 433-34. Finally, Wendy is not prejudiced by our construction of the notice, since Wendy did not challenge the notice of appeal when it was filed, and she has filed a brief responding to Mark's arguments without raising a jurisdictional challenge. Therefore, strict technical compliance on the part of Mark is not required since his error is one of form and not substance. We therefore hold that we have jurisdiction. See *id.* at 434.

---

[4] This court may take judicial notice of the docket of the circuit court. See *Wells Fargo Bank, N.A. v. Simpson*, 2015 IL App (1st) 142925, n.4 (taking judicial notice of court clerk's on-line docket entries); see also *In re N.G.*, 2018 IL 121939, ¶ 32 (holding that the appellate court's *sua sponte* taking of judicial notice of court records from the circuit court "was well within [its] authority").

¶ 37    In addition, we note that Mark's docketing statement, which he filed pursuant to Supreme Court Rule 312(a) (see Ill. S. Ct. R. 312(a) (eff. July 1, 2017)) and served on Wendy, stated that the appeal "involves a post-judgment ruling reforming a marital settlement agreement.  [Mark] contends the circuit court did not have authority to reform the MSA and made findings that were against the manifest weight of the evidence."  Although the docketing statement merely provides this court with "general information about a case docketed in the court and it is not intended to replace the notice of appeal" (*General Motors Corp. v. Pappas*, 242 Ill. 2d 163, 178 (2011)), Mark's docketing statement nonetheless provides further support for our holding that we have jurisdiction, and Wendy suffered no prejudice from Mark's error.

¶ 38    Another infirmity in this appeal is that the record on appeal does not include a report of proceedings for the hearing on Mark's motion to reconsider, as required by Supreme Court Rules 321 and 323.  See Ill. S. Ct. R. 321 (eff. Oct. 1, 2021), Ill. S. Ct. R. 323 (eff. July 1, 2017).  Nor has he filed an acceptable substitute, such as a bystander's report or an agreed statement of facts, as provided for in Rule 323(c).  See Ill. S. Ct. R. 323(c) (eff. July 1, 2017).  The appellant (here, Mark) has the burden of providing a sufficient record of the trial proceedings to support his claims of error. *Foutch v. O'Bryant,* 99 Ill. 2d 389, 391-92 (1984).  In the absence of such a record, we must presume the trial court acted in conformity with the law and with a sufficient factual basis for its findings. *Id.*  Furthermore, any doubts arising from an incomplete record will be resolved against the appellant. *Id.*  With these limitations in mind, we turn to the issues raised in this appeal.

¶ 39    The Battaglia MSA was incorporated into the judgment of dissolution, so we must construe those documents as a single agreement.  See *In re Marriage of Shulga*, 2019 IL App (1st) 182028, ¶ 23.  We construe an MSA in the same manner as a contract. *Id.*  Our primary objective is "to give effect to the purpose and intent of the parties at the time they entered into the

agreement." *In re Marriage of Schurtz*, 382 Ill. App. 3d 1123, 1125 (2008). If the terms of the agreement are unambiguous, we must give effect to that language. *Id.* By contrast, if the agreement is ambiguous, *i.e.*, where the language is susceptible to more than one reasonable interpretation, a court may hear parol evidence to determine the parties' intent. *Id.*; but see *Camp v. Hollis*, 332 Ill. App. 60, 68 (1947) (noting that it is a well-settled rule that, if a contract is susceptible of two constructions, the one that is "rational and probable" must be preferred). Where possible, provisions should be construed harmoniously. *Edward Electric Co. v. Metropolitan Sanitation District of Greater Chicago*, 16 Ill. App. 3d 521, 525-26 (1973). To the extent that an agreement is susceptible to two interpretations, this court will favor the interpretation that is fair, reasonable, and customary, and we will disfavor the interpretation that would lead to an inequitable, unreasonable, or absurd result. See *In re Marriage of Sweders*, 296 Ill. App. 3d 919, 922-23 (1998); see also *Suburban Auto Rebuilders, Inc. v. Associated Tile Dealers Warehouse, Inc.*, 388 Ill. App. 3d 81, 92 (2009) ("Courts will construe a contract reasonably to avoid absurd results."). Moreover, where there is a conflict in the record between the report of proceedings and the common law record, the report of proceedings controls. See *Cook County Republican Party v. Illinois State Board of Elections*, 232 Ill. 2d 231, 237 (2009). Finally, this court reviews the judgment, not the reasoning, of the trial court, and we may affirm on any basis in the record, regardless of whether the trial court relied on those grounds or whether the trial court's reasoning was correct. *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 24 (citing *Leonardi v. Loyola University of Chicago,* 168 Ill. 2d 83, 97 (1995)). We review a circuit court's interpretation of an MSA *de novo*. *Shulga*, 2019 IL App (1st) 182028, ¶ 23.

¶ 40    A written agreement may be reformed to reflect the intention of the parties and the agreement between them. *Suburban Bank of Hoffman-Schaumburg v. Bousis*, 144 Ill. 2d 51, 58

(1991). Although it is assumed that the parties' written agreement expresses their mutual intentions, this conclusion will nonetheless yield to contrary evidence that is clear and convincing. *Suburban Bank of Hoffman-Schaumburg v. Bousis*, 144 Ill. 2d 51, 59 (1991).

¶ 41 Scrivener's errors, also called clerical errors or matters of form, are those errors, mistakes, or omissions that are not the result of the judicial function. *Dauderman v. Dauderman*, 130 Ill. App. 2d 807, 810 (1970). Mistakes of the court, however, are not necessarily judicial errors. *Id.* "The distinction between a clerical error and a judicial one does not depend so much upon the source of the error as upon whether it was the deliberate result of judicial reasoning and determination." *Id.* Where a provision is "manifestly incongruous" with other provisions in the agreement, it is a scrivener's error, and reformation of the agreement to correct the error is proper. See *Estate of Blakely*, 267 Ill. App. 3d 100, 107 (1994) (citing *Metropolitan Life Insurance Co. v. Henriksen*, 6 Ill. App. 2d 127, 134 (1955)).

¶ 42 It is the province of the trial court to determine the credibility of witnesses and we will not disturb the court's findings unless they are against the manifest weight of the evidence. *In re Marriage of Marx*, 281 Ill. App. 3d 897, 901 (1996). In addition, we will not disturb a trial court's judgment in an action for reformation unless it is against the manifest weight of the evidence. *Shivarelli v. Chicago Transit Authority,* 355 Ill.App.3d 93, 100 (2005). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350 (2006). Under this highly deferential standard of review, we will not retry the case (*In re Marriage of Bates*, 212 Ill. 2d 489, 515 (2004)), and in cases where the evidence clearly favors neither party, we are compelled to affirm the trial court because the opposite conclusion is not *clearly* evident (*In re Marriage of Pool*, 118 Ill. App. 3d 1035, 1039 (1983)).

18

¶ 43   In this case, Mark first complains that the trial court failed to hold a full evidentiary hearing on Wendy's motion and that the hearing held was not adequate for the court to reform the judgment. Mark states that, in "every case" he reviewed concerning the modification of an MSA, "a full evidentiary hearing was conducted, or should have been conducted." To the contrary, modifying an MSA without holding an evidentiary hearing is not unprecedented. See, *e.g.*, *In re Marriage of Simard*, 215 Ill. App. 3d 647, 651 (1991) (holding that the trial court did not abuse its discretion in modifying the parties' property settlement agreement "without a hearing").

¶ 44   In *Simard*, the parties entered into a property settlement agreement in which the husband agreed to pay his wife $140,000 in exchange for all interest in certain shares of stock. *Id.* at 648-49. The husband subsequently filed a motion to reconsider, explaining that, although the payment was predicated upon the sale of the stock at a price of $11, $12, or $13 per share, the stock actually sold for only $7 per share. *Id.* at 649. The husband thus asked that the court "re-evaluate" the payment amount based upon the actual sale price. *Id.* The court granted the husband's motion, and the wife asked the court for a "reopening of the case for an evidentiary hearing on all aspects of the case." *Id.* at 649-50. The trial court denied the wife's request, and this court affirmed. *Id.* at 650. We noted that the trial court was aware of the parties' assets and how they wanted to divide them, and we added that the court modified the agreement based upon the actual price of the stock, providing the wife with a greater proportion than that originally contemplated in the agreement. *Id.* at 651. Here, the court had knowledge of the parties' debts and that the MSA contemplated a division of all of their debts. Notably, the court also had prior sworn testimony from the parties as well as Mark's testimony. Mark cites to *In re Marriage of Rosenberg*, 2016 IL App (1st) 150772-U, *In re Marriage of Marcus*, 2016 IL App (2d) 150343-U, and *In re Marriage of Doran*, 2012 IL App (2d) 100696-U, all of which are nonprecedential orders issued under Supreme Court

Rule 23. See Ill. S. Ct. R. 23(e) (eff. Jan. 1, 2021). In any event, none of those cases hold that a full evidentiary hearing is a blanket requirement.

¶ 45 Moreover, Mark did not specify to the trial court precisely how the hearing was inadequate. He does not argue that the trial court expressly denied his right to call witnesses or present evidence. Mark points to nothing in the record (and we cannot find anything) indicating that he wanted or attempted to call certain witnesses or present evidence to support his claim that the MSA was drafted to exclude one marital debt and include a duplicate debt (for an amount that was understated by more than $50,000). In his motion to reconsider, Mark did not complain about his inability to present evidence at the hearing or the general inadequacy of the trial court's hearing. Mark's claim of error is therefore forfeited. See *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004) (holding that "a party cannot complain of error which that party induced the court to make or to which that party consented").

¶ 46 Forfeiture aside, the trial court *did* hold a hearing and allowed Mark to testify. It simply found Mark's testimony not credible based upon the other evidence it had before it, including the MSA and Wendy's prove-up testimony. Although the court did not insist upon Wendy cross-examining Mark, there is nothing in the record to indicate that Wendy was denied that opportunity, contrary to Mark's claim. As noted above, it is the trial court's duty to determine the credibility of witnesses, and we will not upset those determinations unless they are against the manifest weight of the evidence. *Marx*, 281 Ill. App. 3d at 901. Here, we cannot hold that the opposite conclusion (*i.e.*, that one debt—to Consumers—was intentionally left out of the MSA and another debt—the First Eagle mortgage—was duplicated for a fraction of the actual balance) was clearly apparent. *Best*, 223 Ill. 2d at 350. Even considering (1) Wendy's prove-up testimony that Mark was to be assigned the Consumers debt and (2) Mark's denial of that assignment at the hearing on Wendy's

motion, the evidence—at best—clearly favors neither party, so we are compelled to affirm the trial court's decision. *Pool*, 118 Ill. App. 3d at 1039.

¶ 47 We do acknowledge that the hearing on Wendy's motion was arguably abrupt, and under certain circumstances not present here, a hearing this truncated could be reversible error. Mark's claim, however, that the court was required to hold a full evidentiary hearing is inaccurate. See *Simard*, 215 Ill. App. 3d at 651.

¶ 48 In addition, the MSA states at the outset that the parties desire to fully settle all of their property rights. Article II of the MSA indicated that the parties' residence, which was secured by a mortgage, would be awarded to Wendy, whereas their office condominium, which was also secured by a mortgage and not a line of credit, would be awarded to Mark. Article V of the MSA listed various debts and liabilities of the parties, including a $9,000 debt assigned to Mark but with the creditor listed "1st Eagle Bank Line of Credit." The evidence is undisputed that there is no $9,000 debt to that creditor but there *is* a debt of approximately $9,000 owed to Consumers. At the prove-up hearing, Wendy explicitly corrected this error and testified under oath that the $9,000 debt was owed to Consumers and not First Eagle. Mark did not dispute this testimony; rather, Mark freely conceded that he was "distracted" during Wendy's testimony and admitted that he did not even hear "for the most part" Wendy's testimony. There was no contradictory testimony, however, such as testimony from Mark disputing Wendy's correction or that portion of the MSA. The report of proceedings further reveals that, following the testimony of the parties, the court ordered, *inter alia*, that Mark and Wendy would be responsible for their own debts "as provided in the agreement and as indicated on the record," which included Wendy's testimony that the creditor for Mark's assigned $9,000 debt was Consumers and not First Eagle. The common law record, however, includes the MSA with First Eagle as the creditor for that debt. Since there is a

conflict between the report of proceedings and the common law record, the report of proceedings must prevail. *Cook County Republican Party*, 232 Ill. 2d at 237. On this additional basis, we may affirm the trial court.

¶ 49 Furthermore, Wendy noted in her motion that allocating the $9,000 Consumers loan to Mark would result in more equitable apportionment of assets and liabilities: Mark would be awarded $186,000 in net assets ($228,000 of assets less $42,000 of debt including the Consumers loan) and Wendy would be awarded $144,000 in net assets ($200,000 of assets less $56,000 of debt). Mark did not dispute these amounts. To hold as Mark argues, the awards would be far more inequitable: Mark would receive $195,000 in net assets, whereas Wendy would only receive $135,000. On these combined facts, Mark's interpretation of this provision of the MSA is manifestly incongruous with the other provisions in the MSA. Therefore, the creditor name in the MSA of "1st Eagle Bank" is a scrivener's error, and the trial court properly reformed the agreement to correct it. See *Blakely*, 267 Ill. App. 3d at 107.

¶ 50 Mark repeatedly argues that his signature on the loan application for the Consumers debt was forged, which is in essence his rationale for refusing to repay this debt. He raised this precise argument, however, earlier in the proceedings—specifically, in his combined petition seeking reimbursement from Wendy. Wendy's answer, however, stated that part of the funds were used for the $40,000 down payment for the office condominium. The trial court denied Mark's request for relief on this point. Mark, however, has included no report of proceedings (or acceptable substitute) for the hearing on his combined petition. As with Mark's motion to reconsider, we must therefore assume that the trial court's order complied with the law and relied only upon competent evidence. See *Foutch,* 99 Ill. 2d at 391-92. So here, we must presume that the court rejected his claims of forgery and that the Consumers debt was not used for his office.

¶ 51     Mark also complains that Wendy's motion should have been labeled a petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2020)).  Setting aside whether this would undermine Mark's defense (the quantum of proof for a section 2-1401 petition is merely a preponderance of the evidence and our standard of review is an abuse of discretion (*In re Marriage of Johnson*, 237 Ill. App. 3d 381, 394 (1992)), we find that Wendy's motion was in substance a 2-1401 petition.  It is well established that "the character of [a] pleading is determined from its content, not its label."  *Sarkissian v. Chicago Board of Education*, 201 Ill. 2d 95, 102 (2002) (citing *Barnes v. Southern Ry. Co.*, 116 Ill. 2d 236 (1987), *overruled on other grounds in Miller v. Consolidated Rail Corp.*, 173 Ill. 2d 252, 266 (1996)); see also *People ex rel. Alvarez v. $59,914 United States Currency*, 2022 IL 126927, ¶ 15.  Mark again cites multiple cases involving 2-1401 petitions to reform MSAs, but none of those cases disturb the point of law that the character and not the title of a pleading controls.  See *In re Marriage of Shaner*, 252 Ill. App. 3d 146 (1993), *In re Marriage of Johnson*, 237 Ill. App. 3d 381 (1992).  We therefore reject Mark's argument on this point.

¶ 52     With respect to Mark's argument that the hearing was "tarnished" based upon the fact that the trial court briefly muted Mark's attorney while Wendy's attorney was arguing, the record belies Mark's claim.  The hearing was held over the Zoom videoconferencing platform due to Covid-related restrictions.  In addition, the record indicates that the court only muted Mark's attorney because he was disrupting the hearing and making it difficult (if not impossible) for the other participants, including the court reporter, to hear what was being said.  When Wendy's attorney finished making her arguments, the trial court promptly allowed Mark's attorney to "unmute" himself and make his arguments or lodge whatever objections he had.  Contrary to Mark's claim, this was not the equivalent of excluding his attorney from the courtroom:  there is nothing in the

record (nor does Mark point to anything) to show that his attorney was removed from the Zoom hearing; rather, he was merely muted and was able to hear and see the proceedings, and even indicate any objection nonverbally (which Mark himself did when the trial court noted on the record that Mark was "vigorously shaking his head no"). On these facts, Mark's characterization of the hearing being tarnished is unavailing.

¶ 53    Finally, Mark asserts that the court improperly allocated $9,000 of Wendy's portion of a debt to Mark's parents to Mark. Mark seems to suggest that the court should have instead ordered Mark to repay Wendy directly. "The trial court has broad discretion in determining an equitable apportionment of marital property, and an abuse of discretion will be found only when no reasonable person could take the view adopted by the trial court." *In re Marriage of Adan*, 263 Ill. App. 3d 566, 569 (1994). It is undisputed that the funds to repay the $9,000 Consumers debt were automatically withdrawn from Wendy's assets. As a result, the court ordered Mark to repay $9,000 of Wendy's share of the debt owed to his own parents. We cannot hold that no reasonable person would take the trial court's view on this point, so it did not abuse its discretion, and Mark's contention of error is rejected.

¶ 54                                CONCLUSION

¶ 55    The circuit court did not err in reforming the parties' MSA that had ascribed a marital debt to the wrong creditor. Accordingly, we affirm the judgment of the circuit court.

¶ 56    Affirmed.