In the

# United States Court of Appeals
## For the Seventh Circuit

No. 10-2528

INTERNATIONAL UNION,
UNITED AUTOMOBILE, AEROSPACE
& AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, and its
LOCAL 2343,

*Plaintiffs-Appellants*,

*v.*

ZF BOGE ELASTMETALL LLC,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 2:08-cv-02260-MPM-DGB—**Michael P. McCuskey**, *Chief Judge*.

ARGUED DECEMBER 7, 2010—DECIDED AUGUST 19, 2011

Before RIPPLE, KANNE and SYKES, *Circuit Judges*.

RIPPLE, *Circuit Judge*. The International Union, United
Automobile, Aerospace & Agricultural Implement
Workers of America ("UAW") and its Local 2343 (collec-

tively, the "Union") brought this action against ZF Boge Elastmetall LLC ("ZF Boge") in the United States District Court for the Central District of Illinois. The Union claimed that ZF Boge breached the operative collective bargaining agreement ("Agreement" or "CBA") by closing a manufacturing plant in Paris, Illinois, after it had secured various concessions from the Union, which represented the employees at the Paris facility. Proceeding under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, the Union requested both damages and specific performance of a provision in a labor agreement that, it contends, required ZF Boge to maintain the operation of the Paris facility following a consolidation of operations with a facility in Hebron, Kentucky. The parties filed cross-motions for summary judgment, and the district court entered judgment for ZF Boge. The Union now appeals.

We agree with the district court that the concessions did not require the Paris facility to be kept open beyond the expiration of the CBA.[1] Accordingly, we affirm the judgment of the district court.

---

[1] Because we agree with the district court that the 2007 Agreement was intended to be only a modification that did not create vested rights or otherwise lasting obligations, we do not consider ZF Boge's alternate arguments for summary judgment, including that the Union failed to exhaust contractual remedies.

# I

## BACKGROUND

### A. Facts

At the times relevant to this action, ZF Boge operated two manufacturing facilities in the United States that produced rubber and metal brushings for use in the automotive industry. The facility in Paris, Illinois, was unionized and operated under the terms of successive collective bargaining agreements. The relevant agreement covered the period of April 3, 2005, through April 6, 2008. The facility in Hebron, Kentucky, was nonunion at all relevant periods.

In early 2007, in the face of "significant operating losses," R.43 (R.37, Vol. V), Ex. KK, ZF Boge began studying consolidation of its manufacturing operations. Beginning in April 2007, ZF Boge approached the Union representing the Paris employees and requested to reopen several provisions of the CBA that it deemed "non[-]competitive." *Id.*, Ex. QQ. The Union's membership initially rejected the request to bargain about items included in the governing CBA, including pensions, shifts, job selection and payroll administration. Plant Manager Marc Vonderlage subsequently asked the membership to reconsider by explaining in a memo to employees that the purpose of renegotiation was "to position this plant so that it has the best chance of being chosen to remain open and viable in the long term." R.1, Ex. B. Union members were reassured that, before any agreement was reached, it would be presented for approval to the membership and that "none of the changes agreed

to will take effect unless this plant is chosen to stay open."
*Id.* A week after Vonderlage's memo was sent, the members voted to begin bargaining on the contested items.

The Union and ZF Boge reached an agreement, signed on June 25, 2007, with respect to the terms that had been reopened for negotiation. The 2007 Agreement (or the "mid-term Agreement") was titled, "Agreements: ZF Boge Elastmetall/UAW 2343 regarding items discussed to influence the plant selection decision and long term viability of the Paris facility." R.1, Ex. A at 1. It is written in chart form, placing the previously negotiated provision of the still-in-effect 2005 CBA next to the newly negotiated terms, topic-by-topic. In addition to the concessions requested by ZF Boge, such as a pension freeze and biweekly payroll, the Union negotiated more generous 401(k) provisions, including a defined contribution of three percent for all employees and additional matching contributions, as well as the addition of five employees to the bargaining unit. Although the mid-term Agreement contained no introductory materials or comprehensive statements, the final page included a section titled, "Notes regarding these agreements," which provided, in relevant part:

> None of these items will be implemented unless Paris is the plant chosen to remain in operation after the consolidation. If Paris is NOT the chosen facility, it will continue to operate under the old UAW contract.

*Id.* at 8. After setting implementation times for the various provisions, some of which depended on the date of "an

official announcement regarding the consolidation plan," the mid-term Agreement concluded with the note:

> It is mutually agreed between the company and union bargaining teams that the items revised through this process will not be subject to change in the next contract negotiations.

*Id.*

On June 20, 2007, after the mid-term Agreement had been reached but before it had been signed, ZF Boge announced to its employees that the decision had been made to close the Hebron facility and to keep the Paris facility open. Consolidation began, and some equipment and orders were transferred from Hebron to Paris. Some Hebron employees were permitted to transfer to another division, more left voluntarily in anticipation of future closure, and, for at least some remaining Hebron employees, severance agreements were prepared. Although the Hebron plant shrunk its workforce by roughly thirty percent in this period, it did not completely close.

In February 2008, while the consolidation process was ongoing, the Union and ZF Boge began negotiating a new CBA for the Paris facility. Negotiations became acrimonious in the days before the existing CBA expired, and, without a new contract, the Union members went on strike on April 6, 2008. Bargaining continued. In mid-to-late April, ZF Boge informed the Union that it was reconsidering the decision to consolidate to the Paris facility, and it announced that it would begin decision bargaining on the issue. Following that bargaining, ZF Boge announced that it would reverse the ongoing

consolidation process, close the Paris facility and maintain the facility in Hebron. On April 21, 2008, the Union made an unconditional offer to end the strike and return to work. Although the record is not entirely clear on the point, it appears that the striking workers returned to work, but the plans moved forward to close the Paris facility.

The Paris facility was closed by the end of 2009. The Hebron facility remains open.

## B.  District Court Proceedings

In October 2008, the Union filed this action in the district court. It alleged that ZF Boge breached the mid-term Agreement when it accepted and implemented the concessions of the Union but later reversed course and allowed the Hebron, not Paris, facility to survive consolidation. The Union sought both damages and specific performance, which, in its view, required ZF Boge to close the Hebron plant and reopen the Paris plant.

Following discovery, the parties filed cross-motions for summary judgment. ZF Boge made three independent arguments for summary judgment in its favor: that (1) the mid-term Agreement, and all obligations arising under it, expired with the 2005 CBA in April 2008; (2) the Union failed to exhaust its contractual remedies by grieving and arbitrating the dispute; and (3) even if the obligations under the mid-term Agreement continued past the expiration of the CBA, the mid-term Agreement had not been breached, because ZF Boge was only

required to "select" Paris, which ZF Boge did during the term of the CBA, R.37 at 22. The Union contended principally that the mid-term Agreement, although it modified the CBA, also created independent obligations that did not expire in April 2008. It further contended that, even if the mid-term Agreement had expired, the company still breached it during its effective period when the company failed to consolidate all of its operations at the Paris facility upon obtaining the concessions.

The district court entered summary judgment for ZF Boge. It grounded its decision exclusively on its conclusion that the mid-term Agreement was a modification to the CBA that expired with the CBA in April 2008. The court found the structure of the mid-term Agreement and its lack of any independent duration clause persuasive on this question. The court also noted that the CBA contained a provision, not modified in the mid-term Agreement, that provided, "[n]otwithstanding anything else in this Agreement, no act, omission, or event occurring before the initial effective date or after the termination of the Agreement shall give rise to any rights or liabilities under this Agreement nor shall it be subject to arbitration." R.37, Ex. J at 50. The act upon which the claim for breach was made was the decision to reverse the consolidation in Paris to Hebron, which occurred only after the expiration of the CBA and during the Paris strike. Prior to that time, the court noted, consolidation to Paris was in process.

The court did not consider ZF Boge's arguments regarding exhaustion or its argument that there was no

breach even if the obligations of the mid-term Agreement continued past the expiration of the CBA.

The Union timely appealed.

## II

## DISCUSSION

The Union challenges the entry of summary judgment for ZF Boge. First, the Union contends that the district court erred in resolving factual issues in favor of ZF Boge in order to conclude that the 2007 Agreement was a mid-term modification that expired with the CBA. Next, the Union claims that, even if the 2007 Agreement is a mere mid-term modification, certain obligations, including the obligation to consolidate operations in Paris instead of Hebron, survived the expiration of the CBA. Finally, the Union asserts that, regardless of the characterization of the mid-term Agreement, ZF Boge breached the CBA before its term, entitling the Union to specific performance and damages.

We review the entry of summary judgment de novo, construing all facts and drawing all reasonable inferences in favor of the nonmoving party, here, the Union. *Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

**A.**

The district court concluded that the mid-term Agreement was a modification, intended to expire with the CBA. According to the Union, the district court overstepped its bounds and resolved factual disputes in favor of ZF Boge to reach that conclusion.

We begin with basic principles. The proper interpretation of a contract is ordinarily "a matter of law, and where there is no contractual ambiguity, there is no resort to extrinsic evidence, hence no factual dispute to preclude summary judgment." *Diehl v. Twin Disc, Inc.*, 102 F.3d 301, 305 (7th Cir. 1996) (citation omitted). In interpreting collective bargaining agreements in suits under section 301 of the Labor Management Relations Act, we employ federal law. *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456-57 (1957). We approach our interpretive task in the collective bargaining agreement context "in the same way we approach other contracts." *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 405 (7th Cir. 2002). "The starting point in our inquiry is naturally the language of the [a]greement" itself, *id.*, and we proceed to consider the agreement's structure, *see Westinghouse Elec. Corp. v. NLRB*, 809 F.2d 419, 422 (7th Cir. 1987) (noting that questions of contract interpretation are "settled by examining the language, structure, history, and functions of the contract"). Further, "a document should be read as a whole with all its parts given effect, and related documents must be read together." *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005) (stating federal principles of contract interpretation).

The language of the mid-term Agreement is silent about its duration. It provides dates of implementation of the new terms, many of which hinged on the date of "an official announcement regarding the consolidation plan," R.1, Ex. A at 8. However, the mid-term Agreement has no date of expiration. The only provision that hints at any duration whatsoever is the final note in the Agreement, which indicates that the newly negotiated terms would "not be subject to change in the next contract negotiations." *Id*.

Although the language of the mid-term Agreement gives us little help in resolving the issue before us, its structure is of significant help and leaves little doubt that it is intended as a modification to the existing CBA. As we noted earlier, the provisions of the mid-term Agreement are set forth, topic-by-topic, with the "Present Language" under the existing CBA in one column and the "Proposed Language"—the newly negotiated term—in the adjacent column. R.1, Ex. A at 1-4. Presented in this manner, the new provisions are straightforward amendments to existing contractual terms; the clear intent of this structure was to alter specific provisions of the existing contract without doing violence to any of the unchanged terms of the then-existing CBA, including its expiration date.[2] Further, the mid-term Agreement

---

[2] Two of the terms have slight variations to this structure. First, the move to a biweekly, direct-deposit payroll sets "Past Practice" of weekly pay against the "Future Practice" of the newly negotiated term. R.1, Ex. A at 5. Second, the addition of

(continued...)

explicitly provides that, if Paris is not the chosen facility, the Paris plant "will *continue* to operate under the *old UAW contract*." *Id.* at 8 (emphasis added). The plant could not *continue* to operate under an expired contract that no longer bound the parties.

The Union relies heavily on the mid-term Agreement's limitation on renegotiation of the new terms during the next round of bargaining. In the Union's view, because this obligation persisted beyond the date of expiration of the CBA, the mid-term Agreement and the specific obligation to maintain the Paris facility after consolidation also carried independent and longer-lasting significance. The Union believes that this term demonstrates that, even if the contract is primarily a modification to the CBA, it also has the force of a stand-alone agreement, unencumbered by the duration clause of the CBA. Although the Union's position on this language has some initial appeal, the real significance of this language is that it demonstrates that the parties formulated the mid-term Agreement on the premise that their future relationship would be governed by a *future* CBA. Indeed, the fact that the 2007 terms were not open to negotiation is rendered meaningless without a successive CBA in which those terms would have continued

---

[2] (...continued)
employees to the bargaining unit apparently had no term in the CBA to modify, so it is set forth simply as a new term. *Id.* at 6. These small differences in structure for these specific terms do not detract from the overall structure of term-by-term modification against the original CBA.

to operate. The underlying promises do not, of their own force, bind the parties outside of the context of the CBA that they modified.

Consequently, we agree with the district court that the proper interpretation of the mid-term Agreement is a term-by-term modification of the existing CBA that leaves all unaltered terms—including the duration clause—of the CBA intact.

**B.**

The Union also submits that, even if the mid-term Agreement is considered a modification of the pre-existing CBA, its terms should be construed as carrying obligations that continued past its expiration. Essentially, in the Union's view, even if the CBA as modified by the mid-term Agreement expired, the right to have the Paris plant maintained over Hebron vested the moment that ZF Boge announced the initial decision and began operating under the concessions. The Union argues that it is entitled to have Paris maintained over Hebron past the expiration date of the CBA.

A contract with a defined expiration may create obligations that extend past the expiration date. *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 207 (1991) ("[C]ontractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement. Exceptions are determined by contract interpretation. Rights which accrued or vested under the agreement will, as a general rule, survive termination of the agreement.");

*Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 606 (7th Cir. 1993) (en banc) ("Sometimes, however, a contract creates entitlements that outlast it."). The Union contends that the right to have the Paris facility survive the consolidation accrued when ZF Boge implemented the concessions, which, by the mid-term Agreement's terms, were not to be implemented unless Paris was "the plant chosen to remain in operation *after* the consolidation." R.1, Ex. A at 8 (emphasis added). Because the parties agree that the consolidation was expected to be a multi-year process, the Union believes that the obligations under the mid-term Agreement also were intended to exceed the term of the CBA. The Union characterizes the condition that Paris remain open a "durationally unlimited commitment" and contends that, if ZF Boge intended otherwise, it should have negotiated specific language to limit that condition. Appellant's Br. 22-23.

We do not believe that the mid-term Agreement supports this interpretation. "Courts are reluctant to interpret contracts providing for some perpetual or unlimited contractual right unless the contract clearly states that that is the intention of the parties." *William B. Tanner Co. v. Sparta-Tomah Broad. Co.*, 716 F.2d 1155, 1159 (7th Cir. 1983) (applying Wisconsin law, but citing 3 A. Corbin, *Corbin on Contracts* § 553 (1960), for this general proposition). In any event, it is reasonable to expect that the parties would have provided explicitly for an unlimited duration for the obligation to maintain Paris if such were the intent of the bargain. It is not a reasonable interpretation of this instrument to view the obligation as continuing. Indeed, the specific concessions were

given only a *limited* extension beyond the expiration of the CBA, and that extension explicitly was noted; it is illogical that the parties would intend the instrument to bind ZF Boge to the Paris facility for a much longer term—indeed, an indefinite one—by its silence when it had been explicit about the much shorter obligation regarding the concessions.

This situation differs significantly from the example of a contract with promises surviving beyond its duration that we presented in *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603 (7th Cir. 1993) (en banc). There, we posited that an employee with an employment contract fixing wages might be discharged before the end of a pay period, thus terminating the contract. We noted the ordinary rule that "when a contract expires, it[]expires. It is at an end." *Id.* at 606. We wrote, however, that, "quite apart from any statutory entitlement that employees may have to be paid at the agreed rate for work actually done, the employee would have a compelling argument that the employer's promise to pay for work actually done had survived the expiration of the contract." *Id.* (citation omitted). In the *Bidlack* example, the employees accrued a right to payment during the contract's term, but, during that term, received nothing. By contrast, here, the Union and its members did not receive a right to some future benefit unfulfilled during the term of the contract. Rather, they provided ZF Boge with the concessions in exchange for the benefit of the bargain that they received *within* the mid-term Agreement's term: The decision to close the Hebron facility and to leave the Paris facility open was made, and the execution of that decision was

undertaken. The result was an additional year of sur-
vivability at the Paris facility. The Union's claim that
considering the duration of the mid-term Agreement
limited to the term of the CBA amounts to requiring the
Union to give concessions for the mere empty words of
ZF Boge simply is not supported by the undisputed
facts of the record.[3]

## C.

Finally, we are convinced that the contract contains
no latent ambiguity, that is, an ambiguity that becomes
apparent only in consideration of the surrounding cir-
cumstances. *See Pastor v. State Farm Mut. Auto. Ins. Co.*,
487 F.3d 1042, 1046 (7th Cir. 2007) (defining a latent
ambiguity). Whether an ambiguity exists is a question
of law reviewed de novo. *Illinois Conf. of Teamsters &*

---

[3] The Union concludes its opening brief with a short argument
that the mid-term Agreement was breached during its term
because ZF Boge failed to render full performance prior to
the expiration of the CBA. This argument is without merit.
Nothing in the mid-term Agreement suggests that ZF Boge
was required to consolidate at all, as the Union repeatedly
has acknowledged. The only requirement was that if a decision
to consolidate was made, Paris must be chosen over Hebron.
During the mid-term Agreement's term, such a decision was
made, and the Company began to consolidate at Paris. There
is no suggestion that, during the term of the mid-term Agree-
ment, ZF Boge did anything to reverse that. That change
occurred only *after* the conclusion of the CBA and *after* the
failure to reach a new agreement.

*Emp'rs Welfare Fund v. Mrowicki*, 44 F.3d 451, 459 (7th Cir. 1994).

Extrinsic evidence as to meaning should be put before the trier of fact only after the court determines that the evidence creates an ambiguity. *AM Int'l, Inc. v. Graphic Mgmt. Assocs., Inc.*, 44 F.3d 572, 575-77 (7th Cir. 1995) (stating Illinois rule and applying it as a matter of federal common law); *see also Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 546 (7th Cir. 2000) (applying practice in interpretation of a collective bargaining agreement). Moreover, "[a]lthough extrinsic evidence is admissible to show that a written contract which looks clear is actually ambiguous, perhaps because the parties were using words in a special sense, there must be either contractual language on which to hang the label of ambiguous or some yawning void . . . that cries out for an implied term. Extrinsic evidence should not be used to add terms to a contract that is plausibly complete without them." *Bidlack*, 993 F.2d at 608 (citation omitted).

The extrinsic evidence offered by the Union in support of its interpretation is insufficient to create such an ambiguity. The Union's evidence of context to support its interpretation of the contract consists primarily of the facts that its members had to be induced to the bargaining table and that contemporaneous statements by ZF Boge's management team indicated that the concessions would not take effect unless Paris was chosen to remain open after consolidation. But these facts add little beyond what is apparent from the face of the 2007 Agreement itself and say nothing about any understanding of

the parties, explicit or implicit, regarding the *duration* of obligations. We already have interpreted those terms as indicating that the 2007 Agreement was a modification of the existing CBA.

## Conclusion

Because the district court, as a matter of law, correctly interpreted the mid-term Agreement to be a modification to the CBA that did not create an indefinite obligation to maintain the Paris plant following a consolidation, we affirm the judgment of the district court.

AFFIRMED