In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 24-2481, 24-2500, 24-2575, & 24-2716

WILLIAM BROKAW PRICE, SHARON PRICE, and WINDFALL PROPERTIES, LLC,

*Plaintiffs-Appellants, Cross-Appellees,*

*v.*

CARRI SCHARF TRUCKING, INC., CARRI SCHARF MATERIALS COMPANY, and JOSEPH A. SCHARF,

*Defendants-Appellees, Cross-Appellants.*

---

Appeals from the United States District Court for the
Central District of Illinois.
No. 1:19-cv-01162 — **Michael M. Mihm**, *Judge.*

---

ARGUED APRIL 15, 2025 — DECIDED JUNE 13, 2025

---

Before EASTERBROOK, KOLAR, and MALDONADO, *Circuit Judges.*

KOLAR, *Circuit Judge.* In 1997, plaintiff William Brokaw Price's parents and defendant Carri Scharf Trucking, Inc. (CST) agreed to a contract for surface-level mining of sand,

gravel, and topsoil on the Prices' property.[1] When CST's mining activity dwindled in the mid-2000s, Brokaw's father Bill Price sent a letter instructing CST not to push accumulated stockpiles of sand into a lake that had formed on the property. As the end of the contract neared in 2010, Bill Price wrote CST about possible future plans for the property but passed away shortly thereafter.

Several years later, Brokaw realized that the property still bore the marks of CST's mining activity. This discovery set off an extended back-and-forth where Brokaw repeatedly demanded CST perform its contractual duty to reclaim the property, CST eventually yielded, and Brokaw then insisted that CST's reclamation activity trespassed on land that was never subject to the contract. After discussions broke down completely, Brokaw (along with his wife Sharon Price and their LLC) sued CST for breach of contract. CST responded with a breach counterclaim based on the Prices' trespass accusations.

The Prices' breach of contract claim proceeded to a jury; CST's counterclaim did not. The first trial in the case was a mistrial. The second ended in a verdict for CST. Afterward, the district court denied the Prices' motion for judgment as a matter of law. It also rejected CST's request for attorney's fees pursuant to a fee-shifting provision in the contract. The Prices now appeal on the merits, while CST cross-appeals on attorney's fees.

---

[1] The parties refer to the three defendants collectively and interchangeably as "CST." We follow their lead. Similarly, we call the three plaintiffs the Prices. Finally, the parties refer to William Brokaw Price as "Brokaw."

We affirm in both respects. Contrary to the Prices' reading, the parties' contract does not set a firm deadline for reclamation, and its requirement that CST obey Bill Price's "reasonable" instructions opens the door to a jury resolving factual disputes about the existence and nature of any such instructions. Thus, the case appropriately reached a jury, which had a sufficient basis for the verdict. As for attorney's fees, the contract's fee-shifting language benefits only a party that enforces the contract's terms, so CST's successful defense at trial does not trigger that provision.

## I. Background

### A. Factual History

William Brokaw Price's parents, Bill and Barbara Price, owned two adjacent parcels of land in McLean County, Illinois, which we will call the Property. One of the parcels, the aptly named Farm Tract, was primarily used for farming, although it also contained a house. The other was the Mining Tract, which held 8.25 million tons of high-quality underground sand and gravel. This material was ideal as aggregate for cement and concrete.

To capitalize on this opportunity, Bill and Barbara signed the relevant Contract with CST in 1997. The Contract afforded CST the right to extract sand, gravel, and topsoil from the Property in exchange for royalty payments based on the amount of material removed from the premises. CST's mining process involved removing topsoil and clay, known as overburden, until the groundwater level rose high enough for a dredge to float and vacuum up the sand and gravel below it. The parties envisioned that the mining would create a small lake on the Property.

At the core of the parties' dispute is Article 14 of the Contract, which we quote in full[2]:

### ARTICLE 14. <u>Condition at Termination</u>

At the end of the Contract period and any extension herein, all equipment and improvements shall remain the property of Scharf. Scharf agrees, at Scharf's expense, to totally remove all of said equipment and improvements, including the scale house, office, building foundations, etc. The lake is to be left with a clean shoreline of thirty-degree slope, and any remaining sand, gravel or overburden will be distributed over the premises. Reasonable plans and directions of Price as to the distribution of said left-over materials shall be complied with at Scharf's sole expense.

Articles 8 and 9 are also relevant. They provide that the Contract is contingent on CST securing government permits for the mining activity, and that CST must comply with those permits and all other environmental regulations.

Finally, Article 18 is the basis for CST's cross-appeal. It specifies that "[e]ither party shall be entitled to recover from the other party any and all costs and expenses, including reasonable attorney's fees, in successfully enforcing the terms and provisions of this Agreement."

Not long after signing the Contract, CST secured the necessary Special Use Permit from McLean County. The permit imposed reclamation obligations that aligned with Article

---

[2] We reiterate that Scharf and CST are interchangeable in this case.

14's guidance on the lakeshore and the distribution of material over the premises. It further commanded that "final reclamation be according to all local, state and federal reclamation requirements at the time the facility is closed to operation, with reclamation proceeding on a continuous basis through-out the life of the facility ...."

CST's mining began as planned but slowed down and eventually stopped after a few years, leading to large piles of sand on the Property. In 2005, Bill Price sent CST a letter instructing that the surplus sand should remain stockpiled until it could be sold, rather than being pushed into the lake.

The Contract was originally set to expire in 2006, but it was extended several times. First, CST exercised a three-year extension right built into the Contract. When expiration again grew near, the parties agreed to two addendums prolonging the Contract's term to June 1, 2010. Then, the parties agreed that Article 4 of the Contract, governing royalty payments for material removed from the Property, would remain in effect until December 31, 2010.

In July 2010, Bill Price wrote CST to seek its opinion on three options for the Property's future: (1) sell more sand (if possible) and then push the remaining sand into the lake and reclaim as required by the Special Use Permit; (2) sell the Property to someone else who would continue to sell the sand, with the Prices and CST receiving proceeds from the sand; or (3) renew the Contract for another year. He died weeks later, before CST could respond. The Prices did not take steps toward any of the three options.

The Contract and Article 4 expired by the end of 2010, and at this part of the timeline, the record goes oddly silent.

Things pick up again in 2013. Theodosia Price, the daughter of Bill and Barbara and brother of Brokaw, realized that the Property was still home to sand mounds and CST's leftover mining equipment.[3] Put another way, it had not been reclaimed. Nor did CST initiate reclamation after the issue was brought to its attention. In 2014, CST sold sand from the Property one last time—the penultimate sale was back in 2009—and made the requisite payment to the Prices.

Around 2015, Brokaw started to demand CST reclaim the Property. The dispute grew more complicated when Brokaw discovered that CST had dug a drainage trench from the Mining Tract's lake to a nearby creek. In the Prices' view, this activity was inconsistent with the Special Use Permit and the trench crossed parts of the Property that were not covered by the Contract (the Farm Tract).

So began years of contentious negotiations between the parties.[4] McLean County, too, stepped in to say that CST was not compliant with the Special Use Permit's reclamation requirements. At one point, CST dug yet another trench against the Prices' will. During this battle over the Property, the Prices sent CST multiple cease-and-desist letters asserting that CST was trespassing on the Farm Tract, while simultaneously ordering CST to finish reclamation of the Mining Tract without

---

[3] Theodosia is not a party to this lawsuit. Neither is Barbara, who passed away in 2017. We need not trace the transfer of the Property between the Prices' various trusts over the years. It suffices to say the Property is now held by William Brokaw Price, his wife Sharon, and Windfall Properties, LLC, the sole members of which are Brokaw and Sharon.

[4] We significantly condense this tumultuous history because it does not bear upon our analysis.

the alleged trespass. In response, CST halted reclamation altogether.

### B. Procedural History

In 2019, the Prices brought claims for breach of contract, trespass, and conversion against CST; only the breach claim is on appeal.[5] CST filed a breach counterclaim related to the Prices' cease-and-desist demands. The district court denied summary judgment on the Prices' claims and granted judgment for the Prices on CST's counterclaim.

Two trials followed. The first ended in a mistrial. As a jury note put it: "Neither side's willing to budge. We've deliberated in good faith. Cannot see a path forward." The second trial concluded with the jury returning a verdict in CST's favor.

After the verdict, the Prices moved for judgment as a matter of law. They argued the Contract terminated on December 31, 2010 (or at least the last remaining part of the Contract did), and Article 14 required CST to reclaim the Property no later than termination. The evidence was undisputed that CST did not complete reclamation by the end of 2010, so under the Prices' reading of the Contract, no reasonable jury could have found for CST.

The district court disagreed and saw no fixed deadline in Article 14 or elsewhere in the Contract. Accordingly, whether CST's delay in reclamation breached the Contract was a

---

[5] In an amended complaint, the Prices also brought claims for anticipatory breach of contract and breach of an agreement (the 1997 Special Use permit between CST and the County) of which they are third-party beneficiaries.

factual question that could only be answered by looking at the "complex interplay between the Contract's terms, the parties' actions, and the regulatory oversight regarding the reclamation." Finding that the evidence was sufficient for a reasonable jury to side with CST, the district court denied the Prices' motion.[6]

Meanwhile, CST unsuccessfully sought more than $700,000 in attorney's fees from the Prices. The district court held that CST's victorious defense at trial did not "enforce" the terms of the Contract, so Article 18's fee-shifting provision was inapplicable. CST continued to pursue fees through a motion for reconsideration and a Rule 60(b) motion for relief, both denied.

We now encounter this case through dueling appeals. The Prices again argue that the Contract's plain language forecloses a verdict for CST, while CST persists in seeking attorney's fees.

## II. Analysis

We begin with the Prices' appeal because if we reverse there, CST's cross-appeal would be moot. Seeing no error in the district court's decision to sustain the jury verdict, we then reach the cross-appeal. Once more, the district court was correct.

### A. The Prices' Appeal

Like they did below, the Prices argue that the Contract set a hard deadline for reclamation that CST did not meet. In their

---

[6] The district court also denied the Prices' alternative request for a new trial, which they do not renew on appeal.

view, CST's breach is obvious and the only issue for a jury to decide is damages. We read the Contract differently.

"A court may enter judgment as a matter of law under Federal Rule of Civil Procedure 50(b) if a party has been 'fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Sun v. Xu*, 99 F.4th 1007, 1012–13 (7th Cir. 2024) (quoting Fed. R. Civ. P. 50(b)). This case turns on the district court's interpretation of the Contract, and our review there is *de novo*. *Beach Forwarders, Inc. v. Serv. By Air, Inc.*, 76 F.4th 610, 613 (7th Cir. 2023).

The parties agree that we apply the contract law of Illinois, so our "primary objective is to give effect to the contracting parties' intent." *Village of Kirkland v. Kirkland Props. Holdings Co., LLC I*, 2023 IL 128612 ¶ 63. To do that, we must take the plain and ordinary meaning of the language of a contract as the best indication of intent. *Id.* (citing *Gallagher v. Lenart*, 226 Ill. 2d 208, 232 (2007)). The well-established "four corners" rule means we limit ourselves to the contract's text unless there is a material ambiguity. *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999). When ambiguity arises, we may consult outside evidence to resolve it. *Id.* at 462–63.

We can start with what is especially clear. The Contract undoubtedly obliged CST to reclaim the Property, yet CST never finished reclamation.[7] For that matter, CST did not begin reclamation until after the Prices objected to the

_____

[7] CST's argument that it should prevail because the Contract never uses the words "reclaim" or "reclamation" is risible. This case is a matter of when and how CST was required to reclaim the Property, not whether that duty existed.

condition of the Property. Even during reclamation, CST insisted on digging trenches that the Prices found unacceptable.

Nevertheless, as this case comes before us, we remain mindful of a jury verdict in CST's favor. The Prices say we should set aside that verdict because Article 14 required CST to reclaim the Property by the termination of the Contract. Article 14's title, "Condition at Termination," initially suggests the Prices are right. But Article 14's text betrays the expectation set by its title. *See Citizens Ins. Co. of Am. v. Wynndalco Enterprises, LLC*, 70 F.4th 987, 1002 n.10 (7th Cir. 2023) (advising that titles and headings are "permissible indicators of the meaning of the text that follows them" but cannot override that text). Only the first sentence explicitly discusses the state of the Property at termination of the Contract.

We reach that conclusion by examining each of the four sentences in Article 14. The first sentence tells us that "[a]t the end of the Contract period and any extension herein, all equipment and improvements shall remain the property of Scharf." The Prices contend that the first sentence's reliance on the end of the Contract carries over into the following sentences. As a plain matter of grammar and punctuation, that clause does no such thing.

The second sentence abandons reference to the Contract's term as a timeline for performance. It instead states: "Scharf agrees, at Scharf's expense, to totally remove all of said equipment and improvements, including the scale house, office, building foundations, etc." What's more, reading the first and second sentences together indicates that the qualification, "at the end of the Contract period," applies to only the first sentence. Why say that CST retains ownership of "all equipment and any improvements" at the end of the Contract period if

CST also had to "totally remove all of said equipment and improvements" by that same time? The clarification that CST owns things that it brought onto and already removed from the Property would be superfluous. Yet if equipment and improvements remain on the Property after the Contract's term, perhaps so that CST can carry out reclamation, it warrants noting they are not the Prices to keep.

When the first sentence's timeline drops out in the second sentence, it's hard to see why it would return for the third sentence: "The lake is to be left with a clean shoreline of thirty-degree slope, and any remaining sand, gravel or overburden will be distributed over the premises." That language explains what needs to happen, but not when. It may be tempting to assume it mirrors Article 14's title and the first sentence by specifying the condition of the Property at the Contract's termination. That reading, however, inserts text that is absent.

Assuming we were still unsure how to interpret Article 14 after the third sentence, the fourth sentence would sway us to CST's position: CST must follow Bill Price's "[r]easonable plans and directions ... as to the distribution of said left-over materials ...." We reject any effort to invert that sentence's meaning to say that CST was bound to wait for Price's instructions before beginning reclamation. But because Article 14 grants Price reasonable discretion, if he chooses, to control CST's activities, it belies the notion that Article 14 also sets a hard deadline for reclamation. What if Price's instructions were inconsistent with reclamation by the Contract's end? The Prices' reading would create the potential for conflict within the Contract, and it is "long established" that Illinois contract law favors constructions that "harmonize[] all the various parts [of a contract] so that no provision is deemed

conflicting with, or repugnant to, or neutralizing of any other." *Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009) (quoting *Coney v. Rockford Life Ins. Co.*, 67 Ill. App. 2d 395, 399 (3rd Dist. 1966)).

Indeed, there is a tension between the Prices' interest in receiving royalties and their interest in reclamation. We know that Bill Price's 2005 letter with instructions on the distribution of sand also conveyed his desire for additional sales, and that his 2010 letter reiterated that aspiration when laying out scenarios for the Property. That evidence creates a material issue of fact for trial—whether Price's directions were reasonable and, if so, how they would have affected the timeline for reclamation.

Article 9 also supports the idea that the Contract did not mandate reclamation by December 31, 2010. Article 9 incorporates the 1997 Special Use Permit, which required CST to complete final reclamation "at the time the facility is closed to operation." Recall that CST had the right to continue selling sand until December 31, 2010. Under the Prices' interpretation that reclamation had to be done by the close of operation, the Property would go from "open to operation" to "closed to operation" at midnight, such that the changing of a calendar corresponded to instantaneous breach. That defies good sense. Even if CST followed the Special Use Permit's specification that CST should reclaim the Property on a "continuous basis," there would be some minimal tasks left to complete after operations came to an end at the Contract's expiration. CST would need at least *some* additional time to finish the work. The upshot is that the date when the Property was "closed to operation," and therefore when the Contract required CST to

finish reclamation, is again a factual question for trial.[8]

There is much to be said about contracts that use bright-line rules to establish certainty. That is not this Contract. Instead of setting a firm timeline, the Contract created a continuing obligation for reclamation that survived its termination. *See Int'l Union v. ZF Boge Elastmetall LLC*, 649 F.3d 641, 647–48 (7th Cir. 2011) ("A contract with a defined expiration may create obligations that extend past the expiration date."). Whether CST satisfied that obligation in a reasonable time and fashion cannot be determined as a matter of law. Yet, had the Contract provided bright-lines, perhaps that would have avoided six years of litigation, two jury trials, and significant legal fees.

The Prices appear to concede that if it was appropriate for the jury to decide this case, the evidence was sufficient to support the verdict. In contrast to the arguments presented on appeal, we cannot help but notice that the trial was not simply about the timeliness of CST's reclamation work. The parties

---

[8] We have one more problem with the Prices' interpretation of the Contract. It is difficult to make sense of the parties' selective extension of only Article 4 until December 31, 2010, as it also means they supposedly allowed the remainder of the Contract to expire on June 1, 2010. Article 4 laid out royalty rates, but it did not expressly give CST the right to operate on the Property, nor the right to remove material. Evidently, for the extension of Article 4 to mean anything, it must have also implicitly extended some other portions of the Contract. Does that include Article 14? In the Prices' interpretation, the answer must be yes; it would be incoherent for the Contract to require CST to reclaim by June 1, 2010 while allowing CST to stockpile and sell material through the end of the year. But that gives reason to doubt the Prices' reading of Article 14. We are skeptical that the parties would move a hard cut-off date for reclamation purely by implication.

focused equally, if not more, on CST's attempt to channel the Property's lake into a creek. We have no license to reassess the testimony and decide whether the Prices were justified in rebuking that activity as an unnecessary intrusion onto the Farm Tract, or if their objections were ultimately unwarranted and self-defeating in preventing reclamation. After all, "we jealously guard the jury's province to weigh conflicting evidence, evaluate witness credibility, and determine the facts." *Sun*, 99 F.4th at 1015.

In sum, because we disagree with the Prices' interpretation of the Contract, at least as a matter of law, we avoid getting mired in the parties' trench warfare. It is enough to say that we have been given no reason to overturn the jury's verdict.

## B. CST's Cross-Appeal

We apply state law to determine CST's eligibility for fee-shifting. *Abellan v. Lavelo Prop. Mgmt., LLC*, 948 F.3d 820, 835 (7th Cir. 2020). In Illinois, "[p]rovisions in contracts for awards of attorney fees are an exception to the general rule that the unsuccessful litigant in a civil action is not responsible for the payment of the opponent's fees." *Id.* (quoting *Kaiser v. MEPC Am. Props., Inc.*, 164 Ill. App. 3d 978, 983 (1st Dist. 1987)).

Here, CST cannot enjoy Article 18's fee-shifting exception because CST did not "successfully enforc[e] the terms" of the Contract. Using the plain meaning of "enforce," as explained by Illinois courts that have encountered similar provisions, CST would only be entitled to attorney's fees if court action compelled the Prices to obey the Contract. *Powers v. Rockford Stop-N-Go, Inc.*, 326 Ill. App. 3d 511, 516 (2nd Dist. 2001) ("[A]

party is entitled to an award of attorney fees under this provision only when she or he can demonstrate that the other party was compelled by the trial court to obey a condition of the lease."). CST's counterclaim did not make it to trial; CST was "not enforcing anything, but merely defending against" the Prices' claims. *Housing Authority of Champaign County v. Lyles*, 395 Ill. App. 3d 1036, 1040 (4th Dist. 2009). Article 18 does not shift fees in these circumstances.

CST contends that the district court should have awarded fees despite the summary judgment ruling that disposed of CST's breach counterclaim, because the jury trial showed that ruling to be erroneous. We are not so convinced by CST's logic. There is a distinction between whether CST's actions breached the Contract (or constituted trespass and conversion) and whether CST had a breach claim against the Prices. Either way, CST disclaims an appeal of the decision that extinguished its counterclaim, and we see no basis for allowing the jury verdict to override summary judgment.

Lastly, CST also raises a policy argument that denying fees would incentivize defendants to pursue counterclaims for the sole purpose of receiving attorney's fees. We doubt that this is a real problem. Meritorious counterclaims will be brought either way, and frivolous counterclaims will be dismissed. Regardless, our role does not allow us to weigh CST's policy concern. Many other contracts specify that prevailing parties shall recover attorney's fees, language that would undoubtedly apply to CST but is not present in the Contract. *See, e.g.,* *Abellan*, 948 F.3d at 835. That is where we stop.

### III. Conclusion

Both the appeal and cross-appeal illustrate that parties must rely on the contracts they signed, not the contracts they wish they would have signed. We AFFIRM the judgment of the district court.